**UNITED STATES of America**

v.

**Thomas L. ROBERTSON, Appellant.**

**No. 72-1781.**

United States Court of Appeals,
District of Columbia Circuit.

Decided Oct. 22, 1974.

As Amended Oct. 22, 1974.

Mortimer M. Caplin and Leon E. Irish, Washington, D. C. (appointed by this Court), were on the brief for appellant.

Harold H. Titus, Jr., U. S. Atty., John A. Terry, Henry F. Greene, Warren L. Miller and Frederick C. Moss, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge, and KAUFMAN,* United States District Judge for the District of Maryland.

BAZELON, Chief Judge.

Appellant, Thomas Robertson, who was found mentally competent to stand trial, expressly refused to invoke the defense of insanity. He was convicted by a jury of second-degree murder, assault with intent to kill while armed and carrying a pistol without a license (22 D.C.Code §§ 2403, 3202, 3204), for which he received concurrent sentences of ten years to life, two to fifteen years, and one year respectively.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

After the jury found that Robertson committed the acts charged, the court held a hearing to consider whether it should raise the insanity defense *sua sponte* and submit the issue to the jury in a bifurcated proceeding. Robertson opposed imposition of the insanity defense. In accordance with that opposition, he called no witnesses and did not cross-examine the witnesses who testified for the prosecution. The hearing culminated in the court's determination not to raise the insanity defense. Robertson now contends in this appeal that this decision was erroneous.[1]

For the reasons set forth herein, we remand the record to the District Court.

## I.

### A. Events of August 20, 1971

The facts in this case are not in dispute. Appellant Robertson suffered a bloody wound over his forehead during a fist fight outside the Academy pool hall sometime between 4:30 and 5:00 on the afternoon of August 20, 1971. The reason for the fight and the identity of Robertson's opponent were not disclosed at trial. After the fight was stopped by on-lookers, Robertson left in his car. He returned approximately one-half hour later and momentarily appeared at the entrance of the Academy pool hall. He then crossed the street to another pool hall before once again returning to the Academy. Passing by a table where two men were playing pool, he suddenly turned, whipped out a gun, and shot one of the men at the table, injuring him in the shoulder. Robertson then ran out of the pool hall, jumped into his car, and drove the wrong way down a one-way street.[2]

About fifteen minutes later, Robertson was seen in the midst of rush hour traffic, speeding and careening down the wrong lane of busy U Street in the face of on-coming traffic. He collided with a parked car, swerved over into the opposite lane and, after striking still other cars, came to a stop. Robertson then got out of his car, drew a gun, and stopped to talk briefly with the occupants of a car directly behind him, all of whom were Black.[3] Robert Aleshire, whose parked car Robertson had struck initially, was inspecting the damage when Robertson strode across the street towards him. Aleshire, who was White, leaned against the car as Robertson approached. When he reached Aleshire, Robertson shot him at point blank range, once in the shoulder and twice in the chest and abdomen. As one witness described it, ". . . [the] surprising thing [was] that he [Aleshire] made no motion at all. As he turned around, Mr. Robertson was there and he [Robertson] just lifted the gun and shot him."[4]

After shooting Aleshire, Robertson raced down the middle of the street, brandishing his pistol and cursing the "white sons-of-bitches."[5] Seeing a police officer, he shouted, "You are doing it; why can't I?"[6] "Yes, I shot the white honkey son-of-a-bitch. What are you all going to do about it?"[7] A witness who was taken to the police station with Robertson testified that he continued to make such statements throughout the trip, saying, for example: "[a]ll of the white sons of bitches need to be killed or shot, I had did [sic] my part

---

1. Appellant also contends that his conviction for assault with intent to kill should be reversed on the ground that there was insufficient evidence to sustain the jury verdict on the element of intent. Robertson shot the victim at a distance of six feet and injured his shoulder. Such evidence was sufficient to support the jury verdict. *See* United States v. Bridges, 139 U.S.App.D.C. 259, 432 F.2d 692 (1970).

2. Trial Transcript at 89–90, 95–96 (hereafter T.Tr.). A witness testified that the victim had told appellant, "I will carve you." The victim claimed appellant asked him what he had said and he responded, "I didn't say anything to you." Appellant thereupon shot him.

3. T.Tr. at 136–37, 140.

4. T.Tr. at 189.

5. T.Tr. at 145.

6. T.Tr. at 198.

7. T.Tr. at 285.

and I can't do anymore. . . . All the sons of bitches should be shot, . . . and that is the problem there isn't enough of us doing this sort of thing." [8]

### B. Pre-trial Mental Examinations and Status Hearings on the Insanity Defense

At a preliminary hearing on August 30, 1971, the Superior Court of the District of Columbia ordered Robertson committed to Saint Elizabeths Hospital pursuant to 24 D.C.Code § 301(a) for a psychiatric examination to determine competency and mental status at the time of the crime. Addressing the court, Robertson stated:

". . . I'm not going to get justice, I realize this perfectly. See, I'm one who is well versed in whiteness. . . . You won't get your white vengeance. . . . I have never been guilty of nothing [sic] but being born black in a white America—racist white America. . . . But, I am not going to let you think that I do not realize who I am and who you are. You are the beast and I am a man. You say I killed a man. I have killed no man in my whole life."

The court responded, "I will sign the order, gentlemen. We'll make it forthwith. I think he should be at the hospital and not in jail." [9]

While awaiting admission to Saint Elizabeths, Robertson was arraigned before the District Court, which on September 20 entered a new order for commitment to Saint Elizabeths. Shortly thereafter Robertson was admitted for examination. Two letters to the court from Saint Elizabeths Hospital, dated October 21 and November 9, 1971, reported Robertson competent and not suffering from a mental disease or defect. On September 28, the court granted the government's motion for examination of Robertson by Dr. John Cavanagh, a private psychiatric practitioner. Shortly thereafter the court granted Robertson's motions for an examination by Dr. Alyce Gullattee, a psychiatrist, and by Dr. Ronald Dockett, a psychologist, both engaged in private practice.

After all pre-trial mental examinations had been completed, Robertson notified the court at a March 24 status hearing held for purposes of scheduling the trial that, against advice of his counsel, he would not rely on the defense of insanity. Because all of the psychiatric evaluations found Robertson competent to stand trial, his counsel said that they would abide by his decision. The government, however, cited the "bizarre facts of this case" and called the court's attention to the fact that some of the experts' reports contained information supporting an insanity defense.[10]

When the court asked Robertson his reasons for refusing to rely on the insanity defense, he declined to respond, but wrote a note that read: "I refuse to communicate in your language for the duration of my last six hours of incar-

---

8. T.Tr. at 302.

9. Preliminary Hearing Transcript, D.C.Superior Court, at 16–17 (hereafter P.H.Tr.). Even at the preliminary hearing, there was indication that Robertson opposed the insanity plea. The government advised the court to tell "the defendant that the court is ordering that he go to St. Elizabeth's [sic] Hospital so that he doesn't have the idea that his defense attorney is working against him." The court agreed to order the commitment but requested defense counsel to offer information upon which to rest such an order. Defense counsel stated that appellant's family had informed him that:

since about a six month period of this year they have noticed the defendant had se-

vere mental problems and manifested by fits of anger and they have tried to have him committed but efforts have failed. The brother went to Saint Elizabeth's [sic] and inquired as to how he would get his brother in and apparently they were unsuccessful in getting him committed. It has been represented to me that at one time he tried to kill his mother, and his whole family is absolutely terrified because of the rages he goes into. P.H.Tr. at 4–5.

10. Status Hearing Transcript at 11 (hereafter S.H.Tr.). The government made these representations in light of the trial court's authority to raise the insanity defense *sua sponte*. S.H.Tr. at 9.

ceration. By my left side." After reading the note, the court agreed with the government that a pre-trial hearing was necessary to decide whether the insanity defense should be raised *sua sponte* over Robertson's objection.[11]

At the pre-trial insanity defense hearing held April 10, Robertson's counsel informed the court that they had discussed with him the "substantial" merits of an insanity defense, but that he still declined to raise it.[12] Therefore, Robertson's counsel argued, *inter alia*, that imposition of the insanity defense would violate Robertson's Sixth Amendment right to effective assistance of counsel, would improperly interfere with the conduct of the defense, and would violate his right to due process since D.C.Code § 24–301(j), enacted in 1970, transfers the burden of proof of insanity onto the defendant.[13]

The government urged the court to hear and determine the merits first, and then to turn to the insanity issue in a bifurcated proceeding. The court thereupon certified Robertson competent to stand trial and set a trial on the merits. It also announced that if the jury found against Robertson, the court would determine whether a sufficient basis existed for imposing the insanity defense in a bifurcated trial.[14]

## C. Trial on the Merits

On Robertson's motion at the close of the government's case, the court directed a verdict of acquittal on the first degree murder charge and submitted to the jury the lesser included offense of sec-

ond degree murder. The court characterized the circumstances surrounding the death of Aleshire as "uncontradicted evidence that this was an impulsive frenzied act."[15] The court explained:

"We have here testimony in this case what this man's state of mind was, what the situation was at the poolroom, outside the poolroom, . . . inside the poolroom, . . . the Hart shooting [in the poolroom] happened so quickly and under such circumstances there can be no reasonable inference that his state of mind when he left the poolroom was any different from his state of mind when he arrived at 13th and U."[16]

During the last two days of the trial, Robertson had to be carried into the courtroom; his posture was "limp" and his head often rested on the table as if he were in a stupor.[17] The trial court viewed Robertson's conduct as intentional posturing: "I am convinced that he is feigning. I am convinced that it is an act."[18] At a subsequent hearing on whether the insanity defense should be raised *sua sponte,* witnesses called by the government supported the trial court's observations. The Superintendent of the District of Columbia Jail and a United States Marshal reported that, when observed outside the courtroom, Robertson acted "normally."[19] Dr. Albert E. Marland, a psychiatric consultant at Saint Elizabeths Hospital, and Dr. John Cavanagh, a private psychiatrist appointed at the government's request,[20] testified that Robertson's conduct did not indicate a mental disorder but rather conscious malingering.[21]

11. S.H.Tr. at 14–15.

12. Hearing Transcript at 3 (hereafter H.Tr.).

13. H.Tr. at 3–7. Counsel's contention that Whalem v. United States, 120 U.S.App.D.C. 331, 346 F.2d 812 (1965) was rendered inapplicable by the statutory change has not been pressed on appeal and appears to be without substantial merit.

14. H.Tr. at 15.

15. T.Tr. at 400.

16. *Id.* at 399.

17. The record does not indicate whether Robertson was receiving any medication at this time.

18. T.Tr. at 441.

19. Insanity Hearing Transcript at 3–6, 7–10 (hereafter I.H.Tr.).

20. *See* p. 1151 *supra.*

21. I.H.Tr. at 26–27, 35.

## D. Consideration of the Insanity Defense

After the jury found Robertson had committed the acts in question, the court held a hearing on whether the insanity defense should be raised *sua sponte*. The court had before it the differing opinions set forth in the written reports of the experts concerning Robertson's mental state at the time of the crimes. In his written report filed with the court, Dr. Marland described Robertson's history as one of "aggressive nonconformity, [and] assaultive activity." According to Dr. Marland, Robertson reportedly spent much of his time in maximum security and solitary confinement in prisons in Virginia, Ohio, Illinois, Kentucky, Georgia, and Washington, D. C. He was raised in Washington, "mostly in precinct two which he admits is a tough area." Dr. Marland found that although Robertson was polite, his remarks were heavily overladen with "anti-racial philosophy with a lot of double talk." Dr. Marland concluded his report with the diagnosis of "anti-social personality, severe" on the basis of Robertson's past conduct and racial philosophy:

> "I believe that his talk about humanisn is not delusional, but that he is malingering with his double talk. He is impulsive, but not delusional. . . . He has a long history of aggressive antisocial behavior with rebellion against authority, but although

today he denies racism verbally. [sic] Today there is no question of his identity with racial rebellion. He is superior intellectually with an arrogant expression of superiority to most people. He has always been hyperkinetic, he applies the word to himself. His attitude to authority . . . is one of rebellion and aggression. . . ."

■ Dr. Marland testified at the hearing that Robertson was not mentally ill but rather a "sociopathic personality." Robertson did not suffer from a "neurosis" or "psychosis" but instead was diagnosed as "anti-social personality —severe type," defined as "a condition in which a person does not relate well with others." "It is not a mental disorder. It is merely a disturbance."[22] Marland characterized Robertson's conduct after the shooting of Aleshire as consistent with "exhibitionistic tendencies," *i. e.*, those of a "show-off." He asserted, "I knew that he was an exhibitionist before I ever examined him."[23]

The written report of Dr. John Cavanagh, the other prosecution expert, described his version of the shooting. According to the report, Robertson stated (Dr. Cavanagh's comments are in parentheses):

> ". . . [a]ll my education which was aimed at making me white was in the District of Columbia. (Are you white?) I am what I am—The man I allegedly shot was a beast—neither

---

22. I.H.Tr. at 18–20. Dr. Marland did not define the terms "psychosis," "neurosis," or "mental illness." The use of such conclusory medical labels without explanation contributes nothing to the determination of the *legal* issue of defendant's criminal responsibility. "[F]or purposes of the insanity defense, 'mental illness' is a legal term of art. A criminal defendant's responsibility cannot turn on the label attached to his condtion." United States v. Alexander & Murdock, 152 U.S.App.D.C. 371, 471 F.2d 923, 958 (1972) (Bazelon, C. J., dissenting) ; *see also* United States v. Brawner, 153 U.S.App.D.C. 1, 42, 471 F.2d 969, 1010 (1972) (Bazelon, C. J., concurring in part and dissenting in part).

23. I.H.Tr. at 24–25. The Saint Elizabeths staff report which accompanied Dr. Marland's report noted that Robertson's mother reported an incident in which he "disrobed and for the better part of the night terrorized [the family], but did not hurt them, [and] made numerous various statements of his manhood." The staff also reported that while at Saint Elizabeths Robertson quoted from the "literature of the black culture." The staff interpreted these quotations as a means to "reinforce his manhood." Robertson informed the staff that the shooting in the pool hall was not intended to kill the victim. It was simply aimed at "put[ting] an underling in his place." The killing of Aleshire, he claimed, was not murder since "white[s] are [not] human."

white nor black. The worst kind of beast. I was trying, but never succeeded. (They tried to make him white, i. e., an inferior being. The man I allegedly shot was a beast, i. e., not a human being.)"

Robertson, a student at Federal City College, revealed to Dr. Cavanagh that he was writing an essay entitled "In Search of an Identity in Racist White America." According to Dr. Cavanagh's report, Robertson explained his "search" this way (Dr. Cavanagh's comments are in parentheses):

> "The negro has a limited degree of manhood. He can be one-third man. A Black Man is unlimited. I am *a* man. I am the man you think you are. This is a trial for my extinction. They don't want too many me's running around. (He gesticulates constantly. A Black Man has unlimited power *and is not restricted by law.* They have arrested me and by this trial seek my elimination. The powers that be want to eliminate people like "me".)
>
> Murder is no different that [sic] war. (In war one is allowed to kill.)
>
> If a black man kills a white man, it is not a crime. It is getting the oppression off his neck.
>
> If a black man kills a black man, it is murder. I was under a lot of pressure on that day. The tension was due to the circumstances of my birth. People talk about me wherever I am. I am the topic of conversation. (More grandiosity, more need to be respected and looked up to. More hostility against the white man, "circumstances of my birth.")"

Robertson had explicitly asked Cavanagh *to find him competent to stand trial.* Cavanagh interpreted Robertson's remarks to mean that a finding of incompetency would indicate a defect in his character (and presumably impeach his philosophy). In reviewing the content of the interview, Dr. Cavanagh's report

concluded: "Mr. Robertson at first glance appears to be psychotic, but on better acquaintance, it becomes clear that *what appears to be psychotic mental content is more likely an expression of a cultural* [sic] *adopted language."* [Emphasis added.] The doctor diagnosed Robertson as "antisocial personality," which he described as behavior "grossly selfish, callous, irresponsible, impulsive, and unable to feel guilt or to learn from experience and punishment."

In his testimony at the hearing, Dr. Cavanagh indicated that Robertson could distinguish "right from wrong" and could exercise freedom of choice: "[There is] no evidence that would cause me to believe that he was compelled to do anything on that date. . . . He knew it would have been wrong to kill a black man. He wasn't sure it was wrong to kill a white man. But he knew he was breaking the law. . . ."[24] Dr. Cavanagh concluded that Robertson was not schizophrenic at the time of the Aleshire shooting, an opinion contrary to that expressed in the written report of Dr. Gullattee discussed below.

Because Robertson opposed raising the insanity defense, neither Dr. Cavanagh nor Dr. Marland was cross-examined. The court was not requested to appoint independent counsel as amicus and did not do so on its own initiative. Furthermore, the experts who had been appointed at the request of Robertson were not called to testify. One of these experts, Dr. Alyce Gullattee, a psychiatrist, in her written report found Robertson to be competent but "suffering from a mental condition and [his] criminal offenses were a product of that mental condition diagnosed as schizophrenia, schizo-affected type." She reported that Robertson had a history of "juvenile aberrant behavior," had been sentenced under the Youth Corrections Act for a narcotics conviction, and had a prior history of treatment for "emotional problems" as an adult. On examination, Dr. Gullattee found Robertson's

24. I.H.Tr. at 32–33.

emotions frequently inappropriate. He often answered questions not asked of him, behavior that he attributed to extra-sensory perception. Extremely articulate, he seemed to be obsessed with concerns about "his sexual identity and Black ideology." Robertson described himself as a "victim" with "multiple threats to his existence" including "attempts to poison him." Because of these fears, he was "always sensitive to white oppression which interfres [sic] with the economics of Blacks."

The other defendant expert, Dr. Ronald Dockett, a clinical psychologist, found significant psychological impairment. His report stated that, although Robertson "overtly presents the impression of a well-oriented person," on further examination "delusional material becomes apparent." These delusions include "delusions of persecution and influence" as well as the belief that a "computor [sic] is controlling his life." Psychological examination showed Robertson's thinking (cognitive) processes intact. They also showed, however, considerable "sexual confusion," generating rage that could overwhelm Robertson's "splintered" ego and result in aggressive behavior. Dr. Dockett described the identity problems of Robertson as "confused, irrational and basically pathological," which were projected on Whites. These emotional forces created a breakdown in reality testing, contributing to impulsive and destructive behavior.

The government informed the courts that the purpose of the hearing testimony elicited from Drs. Marland and Cavanagh was to counter the findings of Dr. Gullattee. The court acknowledged its awareness of this conflict. Apparently relying on the fact that of all the examining experts only Dr. Gullattee was Black, the court, which was also Black, observed at the conclusion of the hearing:

"Dr. Gallotti [sic] is talking the same language as this defendant; he [sic] is talking it as a psychiatrist, who knows this defendant in a way that Dr. Marland and the other doctor will never know him.

It is a world that they don't understand. It is a world that they are not a part of. It is a world that they only relate to through books.

And that is why Dr. Gallotti's [sic] interpretation and her conclusion that he is mentally ill is only in her attempt to fit his situation and her understanding of it into the lexicon and into the vernacular vocabulary of psychiatric medicine, as we are forced to use it in a court of law. That is what it is all about." [25]

After the government presented its experts, Robertson's request to testify was allowed over the objections of his counsel. Robertson said that his name was not "Thomas L. Robertson" but rather "Thomas X. King." He told the court that the murder of Aleshire was a "double murder" for on that day Robertson, as well as Aleshire, had died, and King was born: "It was life being given as to life being taken." In Robertson's view the trial was a charade: "[W]hat is spoken doesn't matter. It is what is unspoken that counts. What is on the line is nothing. What is between the lines is everything." [26] In response to questions by the government, Robertson stated that he had been "in a prison all my life" and declared that he was "paranoid as the term is understood," and "begging for help." [27]

At the conclusion of this hearing, the trial judge also commented:

"He [appellant] knows that I know that he is not crazy. He knows that I know that he is not crazy.

And all this byplay about his name and all that kind of business—I understand Robertson. And he knows

25. I.H.Tr. at 66–67.

26. I.H.Tr. at 40–42.

27. I.II.Tr. at 53, 56.

that I understand him—because I have dealt with Robertsons over the years, little Robertsons and big Robertsons.

*And I know everything about the condition of life that made him exactly what he is and what he is going to be.*

And what he is going to be. He is not alone.

*The public at large will never understand. But there are people who do.*

Now, there is no basis for me to raise the insanity plea in this case, the insanity defense.

Do you see what he is saying to his lawyers and what he is saying to the community? 'I won't cop out.'

'I won't cop out.'

'I won't cop out.'

No. I will not raise the insanity defense."[28] (Emphasis supplied.)

Appellant was remanded to custody to await sentencing.

### E. Sentencing Hearing

Thereafter, and prior to the sentencing hearing, Robertson was placed in the jail hospital for bizarre behavior and examined by Dr. Alec J. Whyte, a consultant to the Forensic Psychiatric Office for the District of Columbia.

Apparently because he had reported Robertson incompetent to stand sentencing on the basis of his examination and had referred Robertson to Saint Elizabeths for further examination, Dr. Whyte was called by the defense at the sentencing hearing. He testified that his impression, one not confirmed by full diagnosis, was that Robertson was in an "acute psychotic decompensation":

"Well, I found him . . . in a bed without clothes on, rocking back and forth constantly. He responded to my

questions in a completely unintelligible way, usually with a rather bizarre laughter. . . . But none of his responses were in any way appropriate, nor were the . . . emotional responses to the questions . . . what you would expect to the seriousness of the interview."[29]

On the basis of a letter to the court from Saint Elizabeths Hospital reporting that Robertson was competent and that the original hospital diagonsis of "anti-social personality" was confirmed,[30] the court concluded that Robertson was competent and could be sentenced. In addressing the court prior to sentencing, Robertson said of the court's comments concerning Dr. Gullattee's report:

"You [the court] made a statement once before that I was [in] a world— that none of them understood . . . and I have thought about that a great deal, you know. And that was the trest [sic] statement that I ever heard in this courtroom, but I didn't understand it, as you said."[31]

The government argued for a sentence commensurate with the high degree of dangerousness of appellant. In response the court stated,

"[Robertson] is dangerous in our view because you know that the system doesn't understand him. And you know the system can't control him. That is why he is dangerous. They can't control him, except by the use of force. That is why he is dangerous."[32]

Defense counsel argued that Robertson required help. The court responded,

"Don't you understand Mr. Robertson doesn't want your help. He doesn't need it because the only help that can be offered is help that he completely

28. I.H.Tr. at 66–67.

29. Sentencing Hearing Transcript at 6 (hereafter Sen.Tr.).

30. The government argued that the Saint Elizabeths report was more thorough than Dr. Whyte's findings since the Hospital had greater opportunity for evaluation. Defense

counsel, however, noted that the Hospital report had repeated verbatim the diagnosis contained in the earlier report on sanity and competency. Sen.Tr. at 12, 15.

31. Sen.Tr. at 20.

32. Sen.Tr. at 21.

rejected. That is what he is telling you. . . . He will make it on his terms in his good time. That is what he has said. That is what his life has said. . . . He has the capacity for insight. And he has a sensitivity, too, the likes of which few defendants have about his predicament, not just his personal predicament, but his predicament generally." [33]

## II

Counsel for Robertson in this court argues that the overriding factual issue in this case remains unanswered: "What went on in the mind of Thomas L. Robertson [appellant] on August 21, 1971, that caused him to enter a poolroom and shoot a man in the shoulder and minutes later approach a total stranger in the middle of the street and fire fatal shots into his chest and abdomen from point blank range?" [34] Under our system of jurisprudence this kind of question is traditionally left for jury resolution under the rubric of the insanity defense. But here the defendant refused to interpose that defense.

In Whalem v. United States, this court sitting *en banc* held that

. . . when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of

the case. . . . So, our query is whether in this case there was a combination of factors which required the trial judge to inject the insanity issue for, if such factors existed, his failure to do so is an abuse of discretion and constitutes error. [35]

The rule in *Whalem* rests on the belief that "[o]ur collective conscience does not allow punishment where it cannot impose blame." [36] In accordance with that philosophy, the District Court in the present case properly observed that "[n]o insane person—no person with a mental disease or a mental defect—should ever be convicted of a crime in this jurisdiction." [37]

This court has accepted the *Whalem* formulation by repeatedly acknowledging the trial court's authority to impose an insanity defense. While we have acknowledged our power to review the trial court's exercise of discretion, in cases subsequent to *Whalem* we have never overturned a trial court's determination in the matter of raising the defense *sua sponte*,[38] nor have we articulated standards to govern that determination. In *Whalem* the court added in a footnote, "No rigid standard exists to control the District Court in deciding whether it should require the insanity issue to be submitted. As a matter

33. Sen.Tr. at 23–24. At sentencing, the court noted that it could subsequently lower the sentence if appellant's behavior warranted a reduction. Sen.Tr. at 25.

34. Brief for Appellant at 13.

35. 120 U.S.App.D.C. 331, 337–338, 346 F.2d 812, 818–819 (1965), cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965).

36. Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665, 666–667 (1945), cert. denied, 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774 (1948) *quoted in* Durham v. United States, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 876 (1954). *See* Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388, 393 (1961) ("[it is] almost a positive duty on the part of the trial judge not to impose a criminal sentence on a mentally ill person."), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). *See also* Douglas v. United States, 99 U.S.

App.D.C. 232, 239 F.2d 52 (1956); Blunt v. United States, 100 U.S.App.D.C. 266, 244 F.2d 355 (1957).

37. I.H.Tr. at 64.

38. Cross v. United States, 122 U.S.App.D.C. 380, 354 F.2d 512 (1965) was remanded for reconsideration in light of *Whalem* since the trial court had indicated its belief that it lacked power to impose the defense over the objections of the defendant. Otherwise, we have affirmed refusal to raise the defense. *E. g.*, United States v. Simms, 150 U.S.App. D.C. 182, 463 F.2d 1273 (1972); United States v. Bradley, 149 U.S.App.D.C. 405, 463 F.2d 808 (1972); Trest v. United States, 122 U.S.App.D.C. 11, 350 F.2d 794 (1965), cert. denied, 382 U.S. 1018, 86 S.Ct. 634, 15 L.Ed. 2d 532 (1966). *But see* United States v. Bradley, 149 U.S.App.D.C. 405, 409, 463 F.2d 808, 812 (1972) (Fahy, J., dissenting).

**1158**

within the sound discretion of the District Court, this question must be resolved on a case by case basis."[39] In *Cross v. United States* we rejected the government's suggestion that the trial court's determination may be disturbed only if the evidence would require a directed verdict of not guilty by reason of insanity.[40] Nor did this court accept the suggestion that "[t]he 'substantial doubt' test of competency to be tried set out in *Hansford v. United States*, 124 U.S.App.D.C. 387, 365 F.2d 920, . . . [be] transferred to the issue of responsibility [under *Whalem*]."[41]

In this case there is much in the record suggesting that Robertson may have been unable to control himself at the time he committed the acts in question. The acts themselves are sufficiently bizarre to be "suggestive on [their] face of mental illness";[42] indeed, in reducing the charge from first degree murder to second degree murder, the court characterized these acts as "impulsive and frenzied."

Robertson opposed the insanity defense largely, according to some evidence, because of his belief that that defense would impugn the credibility of his racial and political views.[43] However, defense counsel apparently thought it appropriate to raise the insanity de-

fense. He refused to do so solely because Robertson forbade it. Even the government thought that the evidence of mental illness was sufficiently great that there should be careful consideration given to the "interposing of the insanity defense out of an abundance of caution. . . ."[44] Most importantly, perhaps two of the four experts who examined Robertson prior to the hearing which Judge Robinson held in order to determine whether an insanity defense should be interposed, along with Dr. Whyte in his subsequent report, expressed views which in large part were highly supportive of an insanity plea. Additionally, Robertson's behavior at trial raises troubling questions about his mental condition.

 Under the circumstances, it seems clear that Judge Robinson acted fully and most commendably in accord with the spirit of *Whalem* in ordering an insanity hearing. However, once having embarked upon a *Whalem*-type hearing, the trial judge should have insured that he hear evidence supporting as well as opposing the imposition of an insanity defense. The appointment of amicus counsel would appear to be one way of insuring the presentation of such evidence.[45] Drs. Marland and Cavanagh should have been questioned closely as to

39. Whalem v. United States, *supra*, 346 F.2d at 819 n. 10.

40. 128 U.S.App.D.C. 416, 417, 389 F.2d 957, 960 (1968).

41. United States v. Bradley, 149 U.S.App. D.C. 405, 463 F.2d 808, 814 (1972) (Fahy, J., dissenting).

42. Adams v. United States, 134 U.S.App.D.C. 137, 413 F.2d 411, 416 (1969).

43. It would appear from the medical report filed by Saint Elizabeths that Robertson derived his thinking from Franz Fanon, a psychiatrist who wrote about the problems of Blacks in colonial Africa, and who argued that violence was a means needed to free Blacks from White oppression. *See generally* F. Fanon, The Wretched of the Earth (1968) ; F. Fanon, Black Skin, White Masks (1967). *See also* Adams, The Social Psychiatry of Franz Fanon, 127 Amer.J. of Psychiat. 809 (1970).

One of the cruelest ironies of this tragic case is that the victim, Robert Aleshire, whom Robertson viewed as a "white oppressor", was committed to renewal of the central city and dedicated to social justice. In a eulogy delivered by Philip Rutledge, then director of Washington's Human Resources Department, Aleshire was described as a man who "helped to map a strategy for the improvement and conservation of [this city's] human resources—a strategy that through renewing human beings [one could] prevent tragedies such as the one which stalked him at 13th and U." Editorial, I Never Thought of Violence, Washington Post, Sept. 3, 1971, p. 24 at col. 1.

44. H. Tr. at 15.

45. In a situation in which defense counsel is not permitted by his own client, the defendant, to call, examine and cross-examine witnesses, the appointment and participation of amicus counsel may well be the only way to

any problems, defects or incompleteness there may have been either in their written reports or in their oral testimony. The basis for their conclusions as to Robertson's sanity should have been probed. Moreover, one or more of Drs. Gullattee, Docket and Whyte, and/or one or more of the staff doctors at Saint Elizabeths should have testified in sufficient number and in sufficient depth to present to the court views different than those expressed by Drs. Marland and Cavanagh. To hear only from these latter two doctors, in repetition of their earlier expressed written views, was in effect to render repetitious and nugatory a *Whalem*-type hearing. We think that *Whalem* dictates that a trial court's final assessment of conflicting expert opinion and its decision whether or not to raise the insanity defense may not rest solely on the unchallenged testimony of the government experts in the absence of testimony of the other experts. This dictate is especially compelling in this case where Dr. Gullattee, the expert who found the defendant mentally ill, had been characterized by the District Court as one who "knows this defendant in a way that [the government's psychiatrists] will never know him." [46]

The failure in this case to hold a full hearing and the decision to entertain only the testimony of Drs. Marland and Cavanagh is aggravated by the conclusory type of reports offered by these two doctors. Dr. Marland testified for the government that Robertson was not mentally ill but was an "anti-social personality, severe." Dr. Cavanagh reported that Robertson "at first glance appears to be psychotic, but on better acquaintance it becomes clear that what appears to be psychotic mental content is more likely an expression of a cultural [sic] adopted language." [47] What factors led the two doctors to their respective conclusions? This is precisely the kind of question which requires probing by cross-examination.

In the end, any trial judge faced with the problem before the court below will of necessity be required to make an appraisal of the defendant. We note, as Judge Wilkey writes in his dissent, that we are "three white appellate judges who have never laid eyes on the defendant or heard a witness in the case." We note also that the trial judge, a Black, appropriately took into account, as a matter of common sense and his own experience and background, his own "feel" of the defendant. Trial judges instruct jurors as a matter of routine that they should carefully weigh all opinion evidence and should not leave their common sense behind them when they enter the jury room to deliberate and to decide. A trial judge exercising his discretion in a *Whalem* setting should of course do no less. But before a District Court relies upon its own understanding of the defendant, and indicates that in the court's view the community lacks understanding of the defendant, the District Court must set forth the reasons upon which it

---

elicit such evidence. As to the possible duality of roles which the trial judge might play, there are many dangers. *Cf.* the probing analysis of Chief Judge Aldrich in Figueroa Ruiz v. Delgado, 359 F.2d 718 (1st Cir. 1966).

46. I.H.Tr. at 66. The court also noted that Dr. Gullattee undertook the difficult task of trying "to fit [Robertson's] situation and her understanding of it into the lexicon and into the vernacular vocabulary of psychiatric medicine, as we are forced to use it in a court of law." Considerable dispute has arisen over the question of cultural and racial bias in psychiatric practice. *See* Sabshin, Diesenhaus, & Wilkerson, Dimension of

Institutional Racism in Psychiatry, 127 Amer.J.Psychiat. 787, 788 (1970) ("the black American has had to face the charges of white racists that he is supposed to be *innately lazy, unhealthy, unintelligent, and criminal.* White American psychiatry has its equivalent racist stereotypes about the black psychiatric patient: *hostile and not motivated for treatment, having primitive character structure, not psychologically minded, and impulse ridden.*") (emphasis in original). *See also* H. Greer & P. Cobbs, Black Rage (1968) (different norms govern evaluation of symptoms such as "paranoia" and "depression" depending on race of patient).

47. H.Tr. at 12.

rests such conclusions,[48] must articulate the basis for its common sense reasoning, and must hear and consider the differing views of the experts in a case such as this one, in which those differences go straight to the heart of the ultimate issue.

■ The common sense conclusion reached by the trial judge in this case makes especially compelling the need for the full consideration of the testimony of opposing experts. The trial court's decision not to impose the insanity defense rested, in large part, on Robertson's rejection of the defense as a "cop out." Plainly, since it is a defendant's rejection which *triggers* a *Whalem* inquiry, that rejection should not have been controlling. Robertson's rejection and his reasons for it should have been weighed with evidence derived from a full presentation of testimony relevant to the issue of criminal responsibility.

### III

■■ A few further words about *Whalem* would appear appropriate. The rule in that case may itself fly in the face of the views of the draftsmen of the Model Penal Code [49] who, though finding it "desirable" to accord a trial judge the power *sua sponte* to raise the insanity defense in a "proper case" omitted such a provision from the Code as "too great an interference with the conduct of the defense." [50] On the other hand, the use of a bifurcated procedure, pursuant to which the insanity issue remains out of the case until after trial on all of the other merits has been concluded, would seemingly make it possible for consideration to be given to the interposition of an insanity defense without "too great an interference with the conduct of the defense." [51] But be that as it may, we think that *Whalem* itself dictates certain substantive norms and

48. The court did not attempt to itemize the factors on which it relied in claiming to "understand" Robertson. There were, however, records before the court indicating that appellant was raised by his mother in one of Washington's "tougher" areas. His criminal record is extensive. In 1964 he was sentenced under the Youth Corrections Act for a drug-related offense, and his record indicates he was a disciplinary problem, that he was "belligerent" and a "racial agitator." He assaulted two caseworkers, then stabbed a fellow inmate during a fight. For his own protection he was transferred to another federal prison.

49. Relying on the ALI Model Penal Code position in his dissent, our dissenting brother finds no authority in this circuit to support the interposition of an insanity defense against appellant's will. Dissent of Judge Wilkey, page 1167. We think *Whalem* is clear authority. There we said that "in the pursuit of justice, a trial judge must have the discretion to impose an unwanted [insanity] defense on a defendant . . ." *Whalem v. United States, supra,* 346 F.2d at 818-819.

50. Model Penal Code § 403 (Comment, Tent. Dr. No. 4, 1955) ("While it was considered desirable to give the trial judge the power to raise the defense of irresponsibility in a proper case, where a defendant refuses to permit his counsel to do so, such a provision

was finally omitted as being too great an interference with the conduct of the defense."). Other commentators have reasoned similarly. *See, e. g.,* A Goldstein, The Insanity Defense 188 (1967) ; J. Goldstein, The Brawner Rule—Why? or No More Nonsense on Non Sense in the Criminal Law, Please!, 1973 Wash.U.L.Q. 126. *But cf.* ABA Standards Relating to the Function of the Trial Judge 1.1(a) (Tent.Draft, June, 1972) :

The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his own initiative at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial. The only purpose of a criminal trial is to determine whether the prosecution has established the guilt of the accused as required by law, and the trial judge should not allow the proceedings to be used for any other purpose.

51. This court has repeatedly recognized the value of the bifurcated procedure. *See, e. g.,* United States v. Green, 150 U.S.App. 222, 223-224, 463 F.2d 1313, 1314-1315 (1972) ; Holmes v. United States, 124 U.S.App.D.C. 152, 363 F.2d 281 (1966).

procedural devices by which the duty it imposes must be exercised. *Whalem* speaks in terms of a "sufficient question" as to the defendant's "mental responsibility" as the criterion for the court's imposing the insanity defense *sua sponte* and submitting it to the jury. Accordingly, we think a viable construction of the rule in *Whalem* requires that when a "sufficient question" is potentially posed by differing views of experts, the trial judge must conduct on the record a thorough exploration of the same and in addition set forth in reasonable detail the reasons for his own ultimate determination. In reaching that determination he is of course not bound to adopt in whole or in part the views of any expert. But no appellate court in our position can sensibly decide whether the trial judge has explored and exercised his discretion as required by *Whalem* unless the trial judge completes the exploration on the record and thereafter records in sufficient detail the reasons for his own expression of opinion.

The record is therefore remanded for supplementation in accordance with this opinion.

## Separate Statement of Chief Judge BAZELON:

I did not join this court's decision in *Whalem*,[1] nor have I been a member of any division of this court in cases which applied *Whalem*.[2] The issues in *Whalem* have been and continue to be deeply troubling for me. They are painfully posed in the present case by a defendant who claims that the insanity defense denigrates and denies his racial and social protest.

At least until *Whalem* may be reconsidered by the court *en banc*, its flexibility allows confrontation with the ethical conflict between the individual's right to recognition of his protest and society's right to deny such recognition.

WILKEY, Circuit Judge (dissenting):

The exhaustive study which Chief Judge Bazelon has done of this case, reflecting his deep interest in the field of psychiatry as applied to criminal behavior, is indeed a convincing one. But, in contrast to its effect on my two colleagues, I must say that it convinces me that the trial judge did a superb job in handling this case and that no remand for any further proceedings is necessary.

## I. *The Issue Procedurally*

First of all, we should understand the procedural situation as the case comes to us. We are not dealing with a situation in which a defendant was in any way denied the fullest development of a desired insanity defense. We are not dealing with a situation in which the trial judge, on his own volition, sought to interject an insanity defense and in some way prejudiced the trial position of the defendant. We are dealing with a situation in which the defendant, after having been examined and specifically found competent to stand trial, repeatedly made a decision not to plead an insanity defense in his own behalf; in which defendant's counsel declined to cross-examine Government witnesses on the question of mental illness because the defense was not raising an insanity defense; and in which as a final result the District Judge, after the most careful consideration, decided that he should not *sua sponte* inject an unwanted insanity defense into the case. We are, therefore dealing only with a possible abuse of discretion in the trial judge's declination to interpose the insanity defense *sua sponte*.

---

1. Whalem v. United States, 120 U.S.App.D.C. 331, 338, 346 F.2d 812, 819 (1965) (Bazelon, C. J., dissenting).

2. See United States v. Simms, 150 U.S.App. D.C. 182, 463 F.2d 1273 (1972); United States v. Bradley, 149 U.S.App.D.C. 405, 463 F.2d 808 (1972); Cross v. United States, 122 U.S.App.D.C. 380, 354 F.2d 512 (1965); Trest v. United States, 122 U.S.App.D.C. 11, 350 F.2d 794 (1965), cert. denied 382 U.S. 1018, 86 S.Ct. 634, 15 L.Ed.2d 532 (1966).

My two colleagues find that the trial judge made such a decision after an inadequate inquiry. On the contrary, I find in the record and in Judge Bazelon's opinion ample evidence that the court reached this conclusion only after the most detailed study of the question from the very beginning of the trial. First, the trial judge ordered a bifurcated trial, with the insanity defense, if any, to be tried separately only if there was a conviction. Secondly, the trial judge very wisely deferred his own decision on whether there should be an insanity defense interjected by him, since the defendant had strongly refused to have a plea of insanity made, until after the entire trial had been completed and a special hearing held on this question. Thirdly, assuming his own possible responsibility to interpose an insanity defense later if such were warranted, the trial judge carefully observed the defendant's conduct in the courtroom throughout the trial, directed the marshals and jail attendants to observe the defendant outside the courtroom, at such times when he was not aware that he was under observation, and to report their observations to the trial judge.

After studying the four written reports of the three psychiatrists and one psychologist, the trial judge then at a special hearing after the trial heard the testimony of the two psychiatrists proffered by the Government. He then heard testimony regarding an insanity defense from the defendant himself. The psychiatrist and the psychologist who had examined the defendant at the request of defense counsel were not heard, simply because the defense counsel did not wish to put those witnesses forward to raise an insanity defense, but the trial judge had received and had studied their reports in comparison with those of the two psychiatrists proffered by the Government.

## II. Evidence as to Sanity at the Time of the Offense

Neither the psychologist Dr. Dockett in his page and a half report [1] nor the two Government psychiatrists found that

1. "Overtly he presents the impression of a well orientated person with respect to person, place and time. Whereas when his self concept is explored delusional material becomes apparent. His identity is confused, with his sexuality not being integrated over his ego. He has a highly systematized delusional system which incorporates delusions of persecution and influence. His belief that a computor is controlling his life is delusional, with his belief that he has a special mission denoting grandiosity. His history indicates a longstanding pattern of assaultive-aggressive behavior.

. . . . .

"His Rorschach productions are not notably bizarre. In fact his responses, indicate that his cognitive processes are intact. Nonetheless, there is notable sexual confusion present, which generates guilt, internal rage, and which is inadequately defended against by intellectual and compulsive mechanisms. The resultant sexual feelings are unacceptable to him and responded to by his attempting to implement a super-masculine self concept. Nonetheless, his self hatred is intense, and very likely to be manifested in self-destructive behavior. His basic orientation is that of moving against people, whites in particular. His unacceptable feelings and projection onto whites in general. Conse-

quently, his sexual confusion and resultant rage are dealt with by an elaborate delusional system, where he sees himself as being victimized by whites who intend to emasculate him. The threat of emasculation is paramount with survival and triggers his underlying rage.

"Mr. Robertson lacks sufficient internal controls. His emotional life is premature in nature, and poorly socialized. His strong promptings to act overwhelm his splintered ego and are translated behaviorally into aggressive behavior. Strong emotional stimulation results in his controls becoming much weaker, which is very likely to result in acting out behavior as a function of his basic identity problem.

. . . . .

"Summary/Impression: Mr. Robertson presents the general configuration of a highly systematized and encapsulated delusional system which in paranoid in nature. His sexual conflicts are projected onto whites in general. His sexual confusion is paramount and fused with his internal rage. He basically has a propensity to act out in a violent-aggressive manner. Minimal stimulation results in a breakdown of his reality testing and reality contact, with his ego being overwhelmed by primary processes."

the defendant was suffering from a mental disease at the time of the crime; only Dr. Gullattee so stated in her page and a half report.[2]

Under our test in United States v. Brawner [3] I would not read Dr. Dockett's testimony as finding Robertson with a "mental disease or defect excluding responsibility." [4] But however Dr. Dockett's and Dr. Gullattee's conclusions would fit the test of *Brawner*, the trial judge has had that before him in the form of their written reports, even though they were not called to the stand to testify.

The psychiatrist Dr. Marland testified unequivocally that Robertson had an "anti-social personality" "of a severe type," that this was not "a mental disease or defect," and that Robertson was not suffering from "a mental disease or defect" on the day of the crime. Dr. Marland's conclusion was based on five interviews with the defendant, his review of the ward notes of observations made by the staff at St. Elizabeths, and his own observation of defendant during a preliminary hearing.[5]

Dr. Cavanagh, another psychiatrist, examined the defendant on two occasions. He also studied the ward notes and test results. His conclusion was the same as Dr. Marland's, "anti-social personality," definitely "not suffering from a mental disease or defect at that time [of the offense]."

The prosecution also informed the court that a third psychiatrist, Dr. Strawinsky, and a psychologist (unidentified), both of whose conclusions were consistent with those of Dr. Marland and Dr. Cavanagh and were of record in the case, were available to testify if needed.

All in all, it is difficult to see that the District Judge lacked any expert testimony to sustain his conclusion and action taken, or that anything of significance would be added by a further hearing on remand.

### III. *Authorities*

As Judge Bazelon's opinion recognizes, our *en banc* decision in Whalem v. United States [6] is the seminal opinion on the point here. In *Whalem* we defined the

---

2. "It is my professional opinion based upon the result of the complete mental status examination of Mr. Robertson that preceeding [sic] the time and at the time of the alleged criminal offenses committed on or about August 20, 1971, he was suffering from a mental condition and said criminal offenses were a product of that mental condition diagnosed as

"Schizophrenia, Schizo-affective type."

3. 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

4. As we summarized our holding in a court-prepared syllabus:
 1. The court adopts as the criterion of insanity, for all trials beginning after today, the rule stated in § 4.01(1) of the Model Penal Code of the American Law Institute. That rule . . . states: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." . . .
 2. The court retains the definition of mental disease or defect adopted in Mc-

Donald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (en banc, 1962): "A mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially affects behavior controls." (Pp. 983–984).

. . . . .

 5. The court has carefully considered, but rejected, the suggestion that the jury should be instructed to acquit whenever it concludes that there have been substantial impairments in mental or emotional processes and behavior controls such that the defendant cannot justly be held responsible. (Pp. 987–989).
 *Id.* at 3–4 and 971–972.

5. It was in reference to this first observation, of defendant calling attention to himself in court, that Dr. Marland made his comment, "I knew he was an exhibitionist before I ever examined him," cited in Judge Bazelon's opinion. Hearing Transcript at 25.

6. 120 U.S.App.D.C. 331, 346 F.2d 812 (1965).

issue: "Our query is whether in this case there was a combination of factors which *required* the trial judge to inject the insanity issue for, if such factors existed, his failure to do so is an abuse of discretion and constitutes error."[7] To which we footnoted, "No rigid standard exists to control the District Court in deciding whether it should require the insanity issue to be submitted. As a matter within the sound discretion of the District Court, this question must be resolved on a case by case basis."[8] Our *en banc* decision then went on to list in one paragraph the circumstances of the *Whalem* case.

The only single factor differentiating *Whalem* from *Robertson,* which would tend to support the conclusion of the majority here, is that in *Whalem* the only two psychiatric reports both negated a defense of insanity (lack of mental disease and lack of productivity), while in Robertson's case there is the report of Dr. Gullattee, which concludes Robertson was suffering from a mental disease at the time of the crime. The other three reports on Robertson do not so conclude. But, in Robertson's case, cutting against my colleagues' opinion and supporting the action of the trial judge here, is the detailed record of his own observations of the defendant, his own personal understanding of the defendant's problems, the care he took to have the defendant observed not only in but outside the court, in transit and in the cellblock, when the defendant was not aware he was under observation.

What the majority have concluded here, and to me it is astonishing, is that somehow the District Judge was *not fully informed* of the psychiatric evaluation and evidence, bearing on the exercise of his own discretion in interposing *sua sponte* the insanity issue over the objections of defendant. The only purpose of

the remand is to inform the District Judge further. On the very complete and detailed record of the trial judge's observations, thoughts, dialogue, and ultimate conclusion here, I think it inconceivable that we should remand the case so that he may appoint another lawyer in addition to the prosecutor and defense counsel, and put a psychiatrist and a psychologist, whose written reports he has already carefully studied, on the stand for examination and cross-examination. This is all that my two colleagues expect to occur as a result of the remand. And, after that, what result do they anticipate?

This brings to the fore an important distinction between the trial judge's position in *Whalem* and here. In *Whalem* we held: "[A] trial judge must have the discretion to impose an unwanted defense on a defendant and the consequent *additional burden of proof on the Government prosecutor.*"[9] So, in *Whalem,* it was the *prosecutor*[10] on whom we said the trial judge had discretion to thrust an additional burden.

Thrusting an additional burden on the prosecutor is *not* what the majority are doing here. Since *Whalem* the D.C. Code has been amended; this is of the utmost importance, as neither *Whalem* nor any of our other precedents apply. No authority is cited for the result my colleagues want the District Judge to reach here. Under 24 D.C.Code § 301(j) the "burden of proof" is no longer on the prosecutor, it is on the *defendant.* So now my two colleagues are holding that a trial judge had discretion (and an appellate court review of that discretion to compel him to do the job over again) to compel defense counsel (or an *amicus curiae* if defense counsel balks) to prove that the defendant was suffering from a mental disease or defect at the time of

---

7. *Id.* at 819 (emphasis supplied).

8. *Ibid.,* n. 10.

9. *Ibid.*

10. And in every case since following *Whalem.* See Judge Bazelon's Separate Opinion, note 2.

the crime.[11] Defense counsel can be ordered to do this (or have it done for him by an *amicus*) over the objections of both defense counsel and his certified competent client.

It is highly significant that the American Law Institute in the Model Penal Code specifically declined to approve what my colleagues are doing here. Section 4.03 provides: "(1) Mental disease or defect excluding responsibility is an affirmative defense." The ALI Comment on this section states: "While it was considered desirable to give the trial judge the power to raise the defense of irresponsibility, in a proper case, where the defendant refuses to permit his counsel to do so, such a provision was finally omitted as being too great an interference with the conduct of the defense." [12]

I respectfully submit that what my two colleagues do here is in no way sanctioned by *Whalem* or any of our other decisions, raises serious questions as to due process under the Fifth Amendment,[13] equally difficult questions as to effective assistance of counsel under the Sixth Amendment, and does violence to the entire adversary concept of a criminal trial. I would expound at some length on these fundamental objections to what the majority does here, if it were not for the fact that the remand is so clearly and simply not justified on the facts of Robertson's case.

### IV. *Some Ignored Practicalities*

For me the decisive reason why no remand to the trial court is called for is the sheer purposelessness of it all. The trial judge has reached a carefully considered conclusion, on evidence which he deemed sufficient, as to the exercise of his own discretion on interposing an insanity plea in this case over the objections of the defendant and defendant's counsel. In exercising this discretion he has certain tremendous advantages over any member of this court:

(1) As Judge Bazelon points out in his opinion, like the defendant, the trial judge is black, and the trial judge indicated that this was of importance in understanding the defendant's racial expressions, which are spread throughout this trial in language and, of course, before the trial in the heinous homicide.

(2) The trial judge observed the defendant carefully over a period of several days.

(3) While he was observing the defendant, he had the advantage of four (or more) experts' written conclusions in front of him.

(4) He heard two of the experts testify.

(5) He heard the defendant himself testify at the hearing after the trial.

(6) He had the give and take of arguments of counsel live before him on several occasions.

(7) He heard the witnesses live as to the conduct of the defendant on the day of the trial.

(8) The trial judge did not merely have the opportunity to observe a defendant for several days in an ordinary trial, he could and did watch the reaction of this defendant instantly to every specific item of evidence or argument as to the defendant's mental state as it was brought out.

(9) The trial judge, at the request of the prosecutor, had required to be made half-hour written observations of the defendant's conduct outside the trial arena over an eight-day period, when the de-

---

11. "There is no more reason for the prosecutor or judge to displace defense counsel with regard to the insanity defense than there is in the case of alibi or entrapment or a coerced confession or an unlawful search." Goldstein, The Insanity Defense, 188 (1967).

12. Model Penal Code, Tent.Draft No. 4 (1955), p. 194.

13. I need not draw up a catalogue of possible horrors to which defendants might be subjected, if the "defense" of insanity could be interposed over the objection of counsel and defendant. We have the examples current in other countries.

fendant was not conscious that he was being observed.[14]

It was on the basis of all this that the trial judge said, "And I know everything about the condition of life that made him exactly what he is and what he is going to be. . . . The public at large will never understand, but there are people who do. Now, there is no basis for me to raise the insanity plea in this case."

In contrast to the opportunities for understanding by the trial judge, and the clear record evidence that the trial judge made the most of his opportunities to gain a complete understanding of the defendant, we sit here as three white appellate judges who have never laid eyes on the defendant or heard a witness in the case. The only omissions of the trial judge that my two colleagues can point to, that they would have him correct on remand, are:

(1) The trial judge's failure to hear the two experts who reached conclusions differing in one instance sharply and in another in some degree from the two Government experts—but the trial judge had their written reports before him throughout the trial.

(2) The trial judge's failure to have cross-examination of the two experts who did testify—but how valuable would this have been or would it be now in light of the thorough discussion of all four experts' views which did take place?

(3) His failure to appoint an *amicus curiae* to do what defendant's own counsel declined in the interest of the defendant to do.

14. Transcript at 3–4, 7–8:

Q. Pursuant to my request, what type of observation was carried on in terms of Mr. Robertson?
A. Well, we had an officer make notes daily as to his actions while confined.
Q. And on what time schedule was it?
A. Around the clock, from 0001 until 2400 hours.
Q. Did they make notations as to what they observed during each half-hour?
A. Yes, they did.
Q. And would you tell the Court what, if anything, was observed of Mr. Robertson during that time?
A. They observed his actions as being more or less that of a normal person. They observed that he was talking with the other inmates.
However, he was somewhat uncooperative in talking or speaking with the correctional staff.
Q. Was there any unusual, bizarre behavior noted by the staff as to the defendant at any time?
A. No.
Q. Over how long a period was his conduct observed?
A. May 12th through May 20th.
Q. A period of eight days?
A. Right, sir.
　.　　　　.　　　.　　　.
Q. Directing your attention to May 11th, which would have been Thursday, did you have occasion to observe an assistant handling a person by the name of Thomas L. Robertson, the defendant?
A. Yes, I did.

Q. And what were your observations at that time?
A. When we first attempted to take him up to the courtroom, he was in a limp position. He wasn't moving.
Q. What time was this? Do you recall?
A. This was—let's see.
[Looking at document.]
Q. Was it in the afternoon or in the morning?
A. It was in the evening.
Q. Now, what time was it? Do you recall?
A. About 2:00 p.m., approximately.
Q. And what happened at that time? What did you observe?
A. Well, we tried to take him from the cell block up to the courtroom. And he wouldn't walk. He had to be carried.
Q. Were his eyes open or closed?
A. His eyes were open at that time.
Rather, I asked him cut it out. I told him he didn't have to act for us.
At this time he winked his eye. He did like that—[indicating.]—and smiled.
MR. MILLER: May the record reflect that the witness has made a motion of his thumb and first finger in a circle, with the other three fingers extended.
BY MR. MILLER:
Q. Would this be the type of sign like an "okay" sign?
A. Right. That is what it seemed to be to me.
Q. And when he did that, he smiled and winked?
A. Yes, he did.

I respectfully submit that nothing tangible will be gained here by remand, that ordinary deference to the exercise of discretion in a trial judge requires that we leave the case as it is, and under the particular circumstances of this case, given the actions of the trial judge, there is absolutely no reason to ask for him to do anything more to assist in his own determination of whether he will exercise his own discretion to impose an insanity defense over the objections of the defendant.

## V. *Conclusion*

There are two possible results of the remand:

A. The District Judge, after hearing further testimony as my two colleagues desire, will reach the same conclusion as before, *i. e.*, the trial judge should not thrust the burden of an unwanted insanity defense on the defendant; or,

B. The District Judge will order a trial on the insanity defense because

1. He concludes that he should order such a trial *sua sponte* over the objection of the defendant, or

2. The defendant withdraws his objection and asks to interpose the insanity defense.

Under result A, nothing whatever is achieved by the remand, except wasteful expenditure of judicial energy. Under result B.1., the District Judge must perforce have confronted the issue of judicial interposition of an insanity defense over the objection of the defendant, and reached a result contrary to the ALI Model Penal Code. There is no authority supporting such a result. My two colleagues apparently believe such a result can be sustained, in spite of the grave consequences inherent therein, as discussed in Part III, *supra*. Under result B.2., the District Judge must permit the defendant to change his mind about making an insanity defense to a crime occurring 20 August 1971, which was tried in May 1972, after the jury which was then available to hear the second half of a bifurcated trial has long since been dispersed. A complete new trial would be needed. No rational system of judicial administration should tolerate this.

There being no conceivable result from the remand which would enhance the quality of justice in this case, I respectfully dissent.