**UNITED STATES of America**

**v.**

**Frank L. SIMMS, Appellant.**

**No. 71–1684.**

United States Court of Appeals, District of Columbia Circuit.

May 30, 1972.

Mr. Robert A. Ackerman, Washington, D. C. (appointed by this court), was on the brief for appellant.

Messrs. Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Roger E. Zuckerman, and Julius A. Johnson, Asst. U. S. Attys., were on the brief for appellee. Mr. Thomas A. Flannery, U. S. Atty. at the time the record was filed, entered an appearance for appellee.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

PER CURIAM:

Appellant was found guilty by a jury of armed robbery, assault with a dangerous weapon, and carrying a pistol without a license (D.C. Code §§ 22–2901, –3202, –502, –3204), and was sentenced

---

to concurrent terms of five to fifteen years, two to six years, and one year respectively. The charges arose from a nighttime holdup of two men in the vicinity of the Gospel Mission, perpetrated by appellant and another on the evening of June 8, 1968. As the two robbers fled, they were pointed out to a passing police cruiser by the victims, and were apprehended and identified shortly thereafter. An initial frisk of appellant did not reveal the pistol, but after the victims identified appellant as the man who had robbed them at gunpoint the gun was found concealed in his underwear. The other man was tried separately in March 1969 and found guilty of armed robbery and assault with a dangerous weapon.

At trial appellant rested his case without introducing any evidence, and urges as his grounds for reversal here that the trial judge (1) impermissibly "blocked [defense] counsel's efforts to explore the insanity defense," and (2) erred by failing to sua sponte raise that defense before the jury. We find that neither of these contentions is sufficiently supported, and we accordingly affirm appellant's convictions.

I

Appellant's allegation of interference with counsel's attempt to pursue the insanity issue is indeed a serious one, particularly in the absence of any other proferred defense. However, the portion of the record he presents to support this charge is wholly inadequate to carry that argument.

Following the return of the instant indictment in November 1968 appellant sought, and received, commitment to St. Elizabeths Hospital for mental observation, stating he had previously been hospitalized in Virginia for eight months in 1958 and again for three months in 1959. In April 1969 St. Elizabeths reported that he was competent to stand trial, that he was not suffering from any mental disease or defect, and there were no indications of the existence of such conditions at the time of the robbery. An independent psychiatric examination was requested and Dr. Donald A. Kellogg found appellant to be suffering from Sexual Deviation (homosexuality) and Schizophrenia, chronic and undifferentiated, with paranoid features. Dr. Kellogg considered appellant incompetent for trial, and also expressed the view that the robbery had been the product of his mental illness. On August 1, 1969 Judge Pratt, the trial judge here, after a full hearing found appellant incompetent for trial and ordered him committed. Later, on October 30, 1970, St. Elizabeths reported to the court that appellant, though suffering from homosexuality and transvestitism, was competent for trial and that his alleged offenses were not the product of his mental condition.[1] Thereafter a second hearing was held on December 17, 1970, at which the court heard the testimony of one psychiatrist from St. Elizabeths Hospital and the testimony of appellant. The court withheld ruling, however, pending receipt of a report from an independent psychiatrist to be selected by defense counsel. This psychiatrist, Dr. Albert Marland, expressed the opinion that appellant was malingering and that he was without mental disease

---

1. Excerpt from letter dated October 30, 1970 from Dr. Luther D. Robinson, Acting Superintendent of St. Elizabeths:

Dr. Robert H. Robertson, a qualified member of our psychiatric staff, recently reexamined Mr. Simms and the following determinations have been made. Although he is suffering from Homosexuality and Transvestitism, he is now competent for trial by virtue of having a rational and factual understanding of the charges pending against him and being able to consult with counsel with a reasonable degree of rational understanding. Furthermore, on or about June 3, 1968, the date of the alleged offenses, he was not suffering from a mental disease or defect which substantially affected his mental or emotional processes or substantially impaired his behavior controls and if the alleged offense were committed by him, they were not the products of a mental disease or defect.

He is not receiving psychotropic medication.

or defect now or at the time of the crime.[2] On March 25, 1971 Judge Pratt found appellant competent,[3] and the trial on the instant offense was held before him on April 26, 1971.

Prior to trial, at which appellant appeared wearing a woman's dress and a wig, Judge Pratt advised the prospective jurors that appellant had been found competent for trial after examination by St. Elizabeths and an independent psychiatrist and that no insanity defense was going to be raised. A bench conference followed, which is the source of appellant's allegation of judicial interference:

[Defense counsel]: Your Honor, you mentioned about no defense of insanity. I got Kellog[g]'s report, and he said he thought this was a product of insanity. I hadn't thought of it, it was so long ago, the interview, and I don't even know whether I can find Dr. Kellog[g]. . . .

THE COURT: Well, *I don't think*, in view of the findings of two panels

---

2. The full text of the letter dated March 22, 1971 from Dr. Albert E. Marland, Sr. to Judge Pratt follows:

> I examined Frank l. [sic] Simms at St. Elizabeth's [sic] Hospital on February 25, Mrach [sic] 10, and March 18, 1971 and in addition consulted the hospital records.
>
> He is not especially cooperative, evades answering questions, makes contradictory statements and when bluntly accused of previously lying answers "Lets [sic] call it fibbing."
>
> His voice and manner are effeminate, wears women's underthings including a brassiere and long pointed nails. He has made various histrinonic [sic] jestures [sic] to call attention to himself and manipulate the opinion of others explanations.
>
> He admits to wearing women's dresses when "he goes out formally".
>
> Talks much about being lonely and not really having sex. Admits to homosexuality as the passive partner in sodomy.
>
> His history indicates various difficulties. Says he has had "two nervous breakdowns" but gives no satisfactory details.
>
> Says he communicates with his deceased mother and other dead people within his head when he withdraws to himself to think of them. I do not believe he is hallucinated.
>
> I have the definate [sic] impression that he is malingering. I do not believe that the symptoms have base consistent [sic] with a diagnosis of schizophrenia.
>
> DIAGNOSIS: Homosexuality
> Transvestism [sic]
>
> I believe that he is without mental disease or defect which would substantially affect his mental and emotional processes and substantially impair his behavior controls now or at the time of the alleged crime.

He has a rational and factual understanding of the charges against him and can adequately consult with council [sic] in his defense.

3. Judge Pratt's order reads:

> This matter came before the Court for determination of the competency of the defendant to stand trial. He was originally committed to Saint Elizabeths Hospital on July 3, 1969, pursuant to Title 24 District of Columbia Code Section 301(a) for mental examination. An initial competency hearing was conducted on August 1, 1969, and upon consideration of the psychiatric testimony and the testimony of the defendant, the Court found the defendant to be incompetent to stand trial. Accordingly, he was committed to Saint Elizabeths Hospital until restored to mental competency.
>
> By letter dated October 30, 1970, Saint Elizabeths Hospital once again reported the defendant to be competent for trial and without mental illness. A second hearing was conducted on December 17, 1970, at which time the Court heard the testimony of Dr. Robert H. Robertson, a member of the psychiatrict [sic] staff of Saint Elizabeths Hospital, and the testimony of the defendant. At that time the Court withheld ruling pending receipt of a report from an independent psychiatrist to be selected by defense counsel. Such a report was received on March 22, 1971, from Dr. Albert E. Marland, Sr., wherein he concludes as did Dr. Robertson that the defendant is competent to stand trial. Accordingly, it is this 25th day of March 1971,
>
> FOUND that the defendant has sufficient present ability to consult with his counsel with a reasonable degree of rational understanding, as well as a factual understanding of the proceedings against him.

at St. Elizabeths and also Dr. Marland, *that you are required to carry it any further.*

\*   \*   \*   \*   \*   \*

THE COURT: I have heard about this man twice, the first time when he came up for release from St. Elizabeths. At that time I heard the testimony, and in view of the bizarre conduct, I sent him back to St. Elizabeths.

The second time he came up, there was a full report, we had another finding, and I decided that the man was malingering. That was the intimation that we got from St. Elizabeths.

In addition, we had a special examination under court order by Dr. Marland, and Dr. Marland concurred with the prior recommendations of St. Elizabeths.

[Defense counsel]: There was one exception to that.

THE COURT: Dr. Kellog[g]. That's right.

[Defense counsel]: Yes. And he did raise the issue of insanity.

THE COURT: I remember. I remember him particularly.

\*   \*   \*   \*   \*   \*

THE COURT: I am satisfied since St. Elizabeths had him over there under observation day and night, he's been over there a matter of years.

\*   \*   \*   \*   \*   \*

[Defense counsel]: *I just want to put on the record that my basic agreement is with the same position that you have taken here, Your Honor. I have been with this man for three years. I don't want to interpose an insanity defense unless I feel I have a chance.* I feel that tactically, if you introduce it and it falls on its face, you kill your other chances. (Tr. 11–13, emphasis added)

Admittedly, in the face of the strength of the Government's case, appellant had very little "other chance" besides putting the prosecution to its proof and pointing to its evidentiary weaknesses. But this exchange seems to us to unequivocally establish that after three years of representing appellant in these proceedings, defense counsel concurred with the conclusion reached by the psychiatrists and Judge Pratt that appellant was a malingerer. With this impression of his client, and with his expressed opinion that it was tactically unwise to raise an insanity defense "unless I feel I have a chance," appellant's present allegation of judicial interference with defense counsel's decision not to raise the defense is without merit. In reaching this conclusion we note that the tenor of the statement by defense counsel indicates he did not consider himself bound by Judge Pratt's statement and that he desired to express his own independent conclusion. We conclude this indicates that his decision was voluntary and not coerced and hence the judge did not block an insanity defense.

## II

Whether the trial judge should have interposed the defense sua sponte presents a different issue. This court sitting en banc in Whalem v. United States [4] held that

*when there is sufficient question* as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case. . . . So, *our query is whether in this case there was a combination of factors which required* the trial judge to inject the insanity issue for, if such factors existed, his failure to do so is an abuse of discretion and constitutes error.

We added, by means of a footnote:

No rigid standard exists to control the District Court in deciding whether it should require the insanity issue to be submitted. *As a matter within the sound discretion of the District Court,*

---

4. 120 U.S.App.D.C. 331, 337–338 & n. 10, 346 F.2d 812, 818–819 & n. 10, cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L. Ed.2d 100 (1965) (emphasis added).

*this question must be resolved on a case by case basis.*

To evaluate the trial judge's exercise of that "sound discretion" we must examine the factors before him.

We are not confronted in this case with a situation in which the trial judge's decision is complicated by the potentially prejudicial effect evidence of insanity or the implied admission of culpability inherent in the defense might have on the defendant's other substantive defenses,[5] or by the absence, or an inconclusive report, of a psychiatric observation.[6] We are instead presented with a situation in which the prosecution's evidence against appellant was overwhelming beyond all possibility of rebuttal by an experienced trial counsel, and where appellant had previously had the benefit of extraordinarily extensive psychiatric observation. Faced with conflicting psychiatric testimony at the first competency hearing, appellant was given the benefit of the doubt and committed for further treatment. After 15 months of observation and treatment the staff at St. Elizabeths, in an evaluation subsequently reaffirmed by an independent psychiatrist selected by the defense, concluded that appellant was not then, and had not been at the time of the robbery, suffering from any mental disease or defect that could have produced his criminal behavior. The additional suggestion was made that appellant was malingering; a suggestion in which the trial judge concurred following the second competency hearing. At trial, with the same judge presiding as had served at both competency hearings, and with appellant represented by the same counsel who had been appointed to his case three years previously, the bench conference quoted above occurred. Both counsel and court agreed that appellant had no chance of establishing a successful insanity defense on the strength of the psychiatric evidence available. The appellant's uncooperative, seemingly uncomprehending behavior at trial,[7] if genuine, would raise some question of his mental condition. Under such circum-

5. *See, e. g.,* United States v. Ashe, 138 U.S.App.D.C. 356, 427 F.2d 626 (1970); Holmes v. United States, 124 U.S.App. D.C. 152, 363 F.2d 281 (1966); Trest v. United States, 122 U.S.App.D.C. 11, 350 F.2d 794 (1965), cert. denied, 382 U.S. 1018, 86 S.Ct. 634, 15 L.Ed.2d 532 (1966).

6. *See, e. g.,* Patton v. United States, 131 U.S.App.D.C. 197, 403 F.2d 923 (1968); Harper v. United States, 122 U.S.App. D.C. 23, 350 F.2d 1000 (1965), cert. denied, 383 U.S. 951, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966); Whalem v. United States, *supra* note 1, (see especially dissenting opinion of Bazelon, C. J.)

7. For example, following the presentation of the Government's case defense counsel reported to the court that he had been unable to ascertain from appellant whether he wished to testify in his own behalf. The following colloquy ensued:

THE COURT: Mr. Simms, as you probably realize, the Government has completed its portion of the case, its direct case, and now is the time for you to put on your defense, if you have a defense.

Under the Constitution, you have an absolute right to take the stand and testify in your own behalf.

You also have an absolute right not to testify, if you wish not to testify, and the fact that you don't testify cannot be commented on by the Government.

But I would like to ask you at this time whether you would wish to take the stand in your own defense?

THE DEFENDANT: I wish to say this.

THE COURT: What's that?

THE DEFENDANT: I wish to say that—

THE COURT: You wish to say what?

THE DEFENDANT: I spent years and months at the hospital, trying to find myself, and trying to find out what was going on and what's happened, and nobody told me anything, and I'm lost.

THE COURT: Let me ask the question again: do you want to testify?

THE DEFENDANT: I'm lost.

THE COURT: What's that?

THE DEFENDANT: I'm lost.

THE COURT: You're what?

THE DEFENDANT: Lost—l-o-s-t, lost.

THE COURT: You are lost. Well, lost or found, do you want to take the stand?

THE DEFENDANT: I'm lost.

THE COURT: I take it, then, that you do not wish to take the stand.

stances it would not be absolutely certain that his counsel's waiver of the insanity defense represented appellant's wishes in that regard. However that behavior is consistent with the psychiatric evaluation of appellant as a malingerer and under the circumstances the court was entitled to rely upon the finding of competency made at the hearing held the previous month. The prior experience and contacts of Judge Pratt and defense counsel with appellant justify their independent decisions that such behavior was not bona fide.

■ When we consider all the attention the trial judge gave to appellant prior to trial, and the conclusion of the psychiatrists at the time of trial that appellant was without mental disease or defect and was malingering, we conclude that the trial judge's decision not to interpose an insanity defense was not an abuse of his discretion constituting reversible error. We appreciate the substantial effort devoted to this case by appellant's court-appointed counsel, an effort that emphasized aspects of the case that would have been more troublesome without the fully supported finding that appellant was malingering. In view of that finding, however, appellant's convictions must be

Affirmed.

THE DEFENDANT: I don't know what's going on. How can I take the stand for nothing I don't know what's happened, that's what I'm telling you, Your Honor.

THE COURT: All right. If you wish to take the stand in your own defense, you have the right to do so; and if you fail to do it, it isn't because we have failed to tell you.

THE DEFENDANT: I'm lost, Your Honor. I wish to get some help from the hospital.

THE COURT: You have been there for some time.

THE DEFENDANT: I have been refused help, Your Honor. I've been refused everything. They took me and made me put on lady's clothes, and called me a homosexual.

THE COURT: They made you put on lady's clothes?

THE DEFENDANT: The doctors did, kicked me out of the hospital, kicked me out of the hospital. I didn't go there like this.

THE COURT: All right. I've heard enough. You may take Mr. Simms back to his seat.

THE DEFENDANT: They called me a homosexual. The nurses over there were sucking—

THE COURT: Any more of that, and we'll put you out in the cell block. [Defense counsel], I take it from what was just experienced that the defendant, while he has not formally waived his right to take the stand, has indicated that he *does not wish to take the* stand.

[Defense counsel]: I think he so indicates, Your Honor.

(Tr. 73–75.)