UNITED STATES of America

v.

**Beachey L. WRIGHT, Appellant.**

**No. 79–1124.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 1980.

Decided April 22, 1980.

---

**1302**

Amy G. Rudnick * with whom Michael Zeldin (Appointed by this Court) and Sandra Richardson * were on the brief, for appellant.

William J. Bowman, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty. (at the time the brief was filed), Washington, D. C., John A. Terry, Michael W. Farrell, Roger M. Adelman and John H. E. Bayly, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before BAZELON, Senior Circuit Judge, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

Circuit Judge WILKEY concurs in the result and in Parts I and II.

BAZELON, Senior Circuit Judge:

After a two-day evidentiary hearing, the trial judge declined to interpose a defense of insanity over the objections of appellant, Beachey Wright. Wright was charged with destruction of government property (18 U.S.C. § 1361). The indictment alleged that Wright damaged a model of the United States Capitol building and its glass display case, both housed in the Capitol.

Wright was convicted and sentenced to three years imprisonment with credit for time served.[1] In this appeal, he contends that the trial judge abused his discretion in failing to raise the insanity defense *sua sponte* over appellant's objections.

I.

A. *Events of May 16, 1978*

The facts are undisputed. Between 11:30 and 11:45 a. m. on the day of the offense, appellant entered the United States Capitol building, and began "walking around observing the tourists, taking in the building and the artworks and exhibits that were on display."[2] Wright then was "inspired" by the Holy Spirit to commit a symbolic act, intended to warn people of God's impending judgment that the nation "has deviated from his original designs."[3] Wright saw a metal stanchion, used with a cordon to rope off displays. He also noticed a replica of the Capitol building behind a glass display case. He "tossed" the stanchion at the model and the glass case, causing both to break.[4] A police officer on duty heard the crash and arrested Wright.

B. *Mental Examinations and the Competency to Stand Trial Determination*

Following his arrest, appellant was committed to St. Elizabeths Hospital for a mental examination pursuant to 24 D.C.Code § 301(a). The Hospital report represented the shared opinions of psychiatrist Dr. Glenn H. Miller, two other psychiatrists, a psychologist, and a social worker. The report concluded that Wright was competent to stand trial, but had suffered from a mental dis-

---

* Student Counsel.

1. The court ultimately reduced the sentence to time served after Wright had spent 11 months in prison.

2. Trial Transcript, Dec. 6, 1978 (T.Tr.) at 102 (testimony of Beachey Wright).

3. *Id.* at 103–04 (testimony of Beachey Wright).

4. *Id.* at 105 (testimony of Beachey Wright).

ease at the time of the offense; the report also diagnosed him as "Schizophrenia, paranoid type." [5]

The judge found appellant competent to stand trial, but in light of the diagnosis, he ordered further psychiatric examination.[6] Informed by Wright's counsel that Wright would not rely on an insanity defense, the court also appointed an *amicus curiae* to advise the court whether it should impose the defense over Wright's objection. Amicus counsel recommended that an evidentiary hearing be held (1) to determine whether the court should *sua sponte* raise the insanity defense [7] and (2) to "explore carefully the quality of the defendant's decision not to raise the defense." [8]

## C. The Hearing

Three psychiatrists testified at the two-day evidentiary hearing. All three testified

that appellant was competent to stand trial,[9] but their diagnosis differed. Dr. Miller, who contributed to the initial report by St. Elizabeths,[10] diagnosed Wright as suffering from schizophrenia, paranoid type, at the time of the offense. He based his conclusion on 1) appellant's conception of himself as "God's harbinger for future destruction of the world"; [11] 2) his inability "to distinguish reality from fantasy in important ways"; [12] and 3) his apparently compulsive belief in his mission.[13] Dr. Miller concluded that the appellant could "appreciate the wrongfulness of his act" but "could not conform his conduct to the requirements of law." [14] In addition, Dr. Miller said appellant's decision not to raise the insanity defense was "tied in with the psychosis," but not itself delusional.[15]

The two other psychiatrists testified that the appellant was not psychotic at the time

---

**5.** [Wright] is competent for trial by virtue of having a rational as well as a factual understanding of the proceedings pending against him and being able to consult with counsel with a *reasonable degree of rational understanding.* Furthermore, on or about May 16, 1978, the date of the alleged offense, he was suffering from a mental disease, which substantially impaired his behavioral controls, and the alleged offense, if committed by him was the product of mental disease. Although he knew *essentially the wrongfulness of his conduct,* his mental disease prevented him from conforming his conduct to the requirements of the law.

Letter to Clerk, United States District Court for the District of Columbia, from Harold M. Boslow, Acting Chief, Pre-Trial Branch, Division of Forensic Programs, St. Elizabeths Hospital.

**6.** The court ordered further examination by the psychiatric staff of the District of Columbia Department of Human Resources, Forensic Psychiatric Services. The court also granted the government's motion to allow Dr. F. Jay Pepper to examine appellant.

**7.** Memorandum of Amicus Curiae (Oct. 2, 1978) at 13 [hereinafter cited as Amicus Memo # 1].

**8.** *Id.* (emphasis omitted).

**9.** Dr. Glenn H. Miller found Wright competent to stand trial because "[h]e could have easily described to me all the roles of the people in the courtroom"; "he can [assist counsel] very ably"; and "he appreciated the wrongfulness of the act." Hearing Transcript, Oct. 11, 1978 (H.Tr.II) at 21–22. Dr. F. Jay Pepper said that

the appellant demonstrated "that he has a full understanding of what the whole process is about, what pleas are open to him, what the consequences of those pleas could be, what the maximum punishment is, and so forth." Hearing Transcript, Oct. 10, 1978 (H.Tr.I) at 113. Dr. Lawrence Sack concluded that Wright "has a rational and factual understanding of the charges against him, able to assist counsel, understands if convicted he bears the consequences for his actions." H.Tr.I at 71.

**10.** The amicus counsel advised the court that "[i]n terms of actual time spent with the defendant and materials reviewed, Dr. Miller's examination appears to be the most thorough of the three experts." Memorandum by Amicus Curiae (Oct. 20, 1978) at 4 n.2 [hereinafter cited as Amicus Memo # 2].

**11.** H.Tr.II at 10.

**12.** *Id.* at 20.

**13.** *See id.*

**14.** *Id.* at 9.

**15.** *Id.* at 14, 41. Dr. Miller said that Wright had "both rational and irrational reasons" for refusing to raise the defense. *Id.* at 14. Dr. Miller reported that Wright understood the difficulties in raising the defense, and also sought to avoid "a very deep humiliation": he "would rather go around with the label of 'criminal' than 'mentally ill'." *Id.* at 13. But the decisive reasons, Dr. Miller recounted, were that Wright

of the offense, although there were paranoid elements to his thinking. Dr. Pepper said that the appellant "likened himself to Old Testament prophets and mentioned how they had been persecuted[,] and I thought that this was a pretty good display of both the grandiose and the persecutory aspects of the paranoid thinking."[16] Nonetheless, Dr. Pepper testified that Wright was able to distinguish what he thought was God's law from human law, and was capable of choosing which to obey.[17] Dr. Sack similarly found Wright to have "very intense private religious beliefs"[18] and "paranoid thinking," but able to distinguish right from wrong.[19] Both psychiatrists reported that Wright chose to avoid harming himself or the efficacy of his message when he declined to raise the insanity defense.[20]

All three psychiatrists acknowledged that the appellant's case was a difficult one, and that he suffered from some kind of psychological disorder.[21] All three also acknowledged the difficulty in distinguishing passionate religious beliefs from mental illness.[22]

did not believe himself to be insane, and "he would actually be willing to suffer, as I understand it, any amount of torment, any amount of incarceration, any amount of humiliation to bring forth his important view on God, and religion and the world." *Id.* at 13–14. *See also id.* at 38. At the same time, Dr. Miller concluded that Wright "is not delusionally avoiding raising the insanity defense." *Id.* at 14.

16. H.Tr.I at 153. Dr. Pepper also noted a 1973 diagnosis that Wright "was suffering from a paranoid personality rather than paranoid schizophrenia." *Id.* at 107.

17. *Id.* at 146. Dr. Pepper also relied on the appellant's ability to think abstractly, which evidenced lack of psychosis. *Id.* at 108–09.

18. *Id.* at 12.

19. *Id.* at 19–20.

20. *Id.* at 74 (Dr. Sack); *id.* at 157 (Dr. Pepper).

21. Dr. Miller concluded that although the evidence permitted alternative assessments, Wright suffered from psychosis, with paranoid elements. H.Tr.II at 26–29. Drs. Pepper and Sack both found Wright to suffer from psychological disorders that, in their opinions, simply did not rise to the level of seriousness required by the legal standard of insanity. Dr. Pepper concluded:

I am not saying that Mr. Beachey Wright is okay. I am not saying that he is perfectly normal. I am not saying he functions as well as you or I. I am saying that he suffers from a personality disorder, paranoid personality. I am saying that he suffers from that, to an appreciable degree . . . . I have been invited to come to court today to state my views on whether this provided the substantial degree of impairment contemplated under the legal standard and my conclusion for all of the reasons I have stated was it did not.
H.Tr.I at 135–36. Similarly, Dr. Sack asserted:
I don't deny this man was driven by forces within him, forces that represented in a tur-

moil, but I do not maintain—I do not believe that he suffered from a psychosis, and on that basis, I concluded that he was responsible for his behavior, could form his behavior to the mandates of the law.
H.Tr.I at 65–66.
Thus, the experts exhibited a range of views reflecting their notions of the legal standard, *see* n.52 *infra,* and their personal judgment. *See also* Davidson, *Psychiatrists in Administration of Criminal Justice,* 45 J.Crim.L., Criminology, & Police Science 12, 14–16 (1954) (discussing diagnosis of paranoid schizophrenia and paranoid personality).

22. Dr. Miller remarked: "I think this is a very interesting case, because it brings into bold relief some of the problems that we have about deciding whether a person is either mentally ill or whether he is a 'religious fanatic.' I think, in Mr. Wright's case, that you can describe him as either." H.Tr.II at 43.
Dr. Sack was prompted to say, "I do not believe my psychiatric training and experience qualifies me to make judgment in that realm of thinking as to which religious beliefs are crazy and which are not." H.Tr.I at 16–17. He also compared the appellant's views with those of certain religious sects. *Id.* at 62, 69.
Acknowledging an element of religious compulsion, Dr. Pepper stated that Wright's ability to distinguish God's commands from human law indicated his ability to choose which to obey. He reported this statement made to him by appellant: " 'I will admit again that, if this thing is just in my imagination, then I am a sick man, but I don't believe that because of the firm faith in God, the kind of person that he is.' " *Id.* at 154.
Without explaining their reasoning or conclusions, the experts also debated whether appellant's claim to hearing God's voice stemmed from auditory hallucinations or inner convictions. *Compare* H.Tr.I at 54 (Dr. Sack) (inner convictions) *and* H.Tr.I at 92 (Dr. Pepper) (same) *with* H.Tr.II at 26–27 (Dr. Miller) (possible hallucinations; but critical factor is delu-

The appellant, Beachey Wright testified that he had been educated in a private Seventh Day Adventists' grammar school.[23] He described religious experiences starting while he was stationed with the army in Vietnam. After an honorable discharge, he attended college but left in 1971 because "God had told me to go and prophesy" about God's plan to destroy the government.[24] He traveled to Washington, D.C. where he burned American flags in public places.[25] He returned to college, and then traveled again to Washington to perform his prophetic mission. His activities at that time led to an indictment, and ultimately commitment to St. Elizabeths Hospital.[26] Wright said that after visiting religious colleges in the South, he arrived in California, where he worked as a construction worker. Then he left for Washington once more to fulfill his mission—and performed the acts giving rise to the instant indictment.

Wright told the court that he declined to raise the insanity defense not for fear of stigma: "I have a stigma of being an ex-mental patient, as it is."[27] Instead, Wright said he rejected the defense because

> the whole idea of the notion that I am suffering from some kind of mental illness is absurd to me. I know I express a great amount of religious conviction, more so than the ordinary person, but

that is not in itself, as far as I am concerned, an indication of mental illness. I cannot accept a mental insanity plea because it would be a compromise of my faith and the principles that have motivated me up to this point. It would discredit everything that I represent in coming here.[28]

### D. The Court's Order and the Trial

The district court declined to raise the insanity defense over appellant's objection.[29] In its order, the court carefully reviewed the history of the case, acknowledged the conflict among the experts, and cited three related grounds for declining to interpose the defense. First, Wright was able to make "a rational and intelligent choice with respect to raising the insanity issue as a defense."[30] In support, the court noted the appellant's reliance "on a religious ground," on his own conviction that he was not mentally ill, and on his awareness of the possible consequences of raising the defense that could include commitment to St. Elizabeths.[31] Second, the court cited its own observations of defendant in court on at least seven occasions. Finally, the court found the testimony of Drs. Sack and Pepper "credible and believable" although in conflict with the views of Dr. Miller.[32] The court concluded that "Mr. Wright's de-

---

sion). The appellant explained that the voice he heard
> is not physical but yet I hear it, not within my physical ear but yet it is a voice that speaks and it is clear and it is audible, but not in my physical ear. It is a voice that comes from within and I have attempted on numerous occasions to try and explain it and I am often misunderstood.

H.Tr.II at 62–63.

**23.** H.Tr.II at 51.

**24.** *Id.* at 62.

**25.** *Id.* at 63, 66–68, 70.

**26.** *See United States v. Wright*, 511 F.2d 1311 (D.C.Cir.1975). Wright's flag desecration conviction was overturned by the district court judge who found insufficient evidence of specific intent. *Id.* at 1312 n.1. After raising the insanity defense on its own motion, the court also rejected the conviction for destruction of government property, finding Wright not guilty

by reason of insanity. *Id.* at 1312. The court of appeals then ordered Wright released from St. Elizabeths unless the government initiated civil commitment proceedings under the D.C. Code. *Id.* Wright was not subsequently civilly committed. Gov't Br. at 22–23 n.23.

**27.** Wright was hospitalized at St. Elizabeths during 1974 following earlier charges. *See* n.26 *supra*: H.Tr.II at 83.

**28.** H.Tr.II at 76.

**29.** Order, *United States v. Beachey Wright*, Criminal No. 78–309 (Nov. 24, 1978) *reprinted as* Appendix A to Appellant's Brief [hereinafter cited as District Court Order].

**30.** *Id.* at 3.

**31.** *Id.* at 3–4.

**32.** *Id.* at 4.

cision to abandon and reject an insanity defense is not a product of any mental illness or abnormal mental condition but rather a considered determination on his part."[33]

At trial, the arresting officers and a detective gave evidence about the incident alleged in the indictment. One reported that the defendant spontaneously said at the time of arrest, "Jehovah had sent me."[34] The government also obtained testimony from an architectural historian about the value of the model and the cost of repairing both it and the glass display case.[35] Appellant, the sole defense witness, told of his mission to warn of God's pending judgment, and his use of symbolic acts as religious prophesy. The jury found appellant guilty.

At sentencing, the appellant asked for probation, promising that his conduct would not be repeated. He said, "I am not the usual criminal. I just—I am a man of great convictions and I have got to find other ways and means of expressing my beliefs and ideas about this."[36] The judge rejected his request and set the sentence. This appeal followed.[37]

## II.

While knowingly violating the law,[38] the appellant apparently believed sincerely that he was selected to prophesy God's disapproval of the national government.[39] Put this starkly, this case appears destined for a textbook discussion of the moral and political implications of the insanity defense.[40] For here the need to recognize religious or political expression competes with the criminal law's refusal to punish those who cannot fairly be blamed.[41] But no matter what

33. *Id.* Although the district court did not expressly cite the amicus memorandum, it similarly recommended that the court decline to inject the defense. Amicus Memo ♂2 at 6–10. Amicus counsel relied on 1) the objectively rational arguments against the defense in light of appellant's interests; 2) appellant's apparent ability to make a rational decision on the plea; and 3) the aims of sentencing.

34. T.Tr. at 39 (testimony of Officer Travis Smith).

35. T.Tr. at 76–77 (testimony of Anne-Imelda Radus) (model prepared at cost of $21,000; repaired at cost of $200; display case glass replacement cost of $117).

36. Sentencing Proceedings Transcript (S.Tr.), Nov. 10, 1979 at 2.

37. *See* n.1 *supra.*

38. Wright testified that he knew he could be arrested for breaking the model of the capitol and he knew such an arrest could ensue because he broke human law. H.Tr.II at 82. He explained that "[i]n spite of the fact I realized what circumstances would ensue, I still recognize that I was acting under a greater power." *Id.*

39. *E.g., id.* at 63, 66. Wright had this exchange with the prosecuting attorney:
Q: Do you recall—at the time you broke the glass that holds the Capitol at the Capitol, that to do that would violate a civil law? You knew that was wrong, under the law, didn't you?
A: Wrong? I was at that time acting as an agent of a higher power.

*Id.* at 81.
It remains unclear whether appellant believed he was free to disregard the prophetic mission. At times, he testified he had no choice. *See id.* at 66. ("I came back to Washington, D. C., because I was commanded to come back and reengage myself in the activities") *and id.* at 73 ("He urged . . . that He would not accept any excuses as far as my commitment to Him were concerned"). At other points, he indicated a decision based on his own conscience. *See id.* at 80 ("I believe in Him. I know that He has the power and the wisdom to direct my life . . . and I cannot, in good conscience, compromise that, that Faith.").

40. This case bears a remarkable resemblance to a hypothetical example reprinted in a case book on law and psychiatry. *See* Livermore and Meehl, *The Virtues of M'Naghten,* 51 Minn. L.Rev. 789, 841 (1967), *reprinted in* A. Brooks, Law, Psychiatry and the Mental System 115, 120 (1974) ("this patient has the delusion that he is a special agent of God and experiences auditory hallucinations in the form of divine commands"). That example was designed to demonstrate the difference between knowledge of moral and legal wrong for the purposes of the insanity defense.

41. *See United States v. Robertson,* 507 F.2d 1148, 1161 (D.C.Cir.1974) (Separate Statement of Bazelon, C.J.) (discussing "the ethical conflict between the individuals right to recognition of his protest and society's right to deny such recognition").

we may think of these moral and political issues, the doctrinal treatment of Wright's claim is now fixed in our jurisprudence. Before this court is solely the narrow question of whether the trial court abused its discretion in refusing to interpose the defense over appellant's objection.

■ Counsel for appellant argues that "the testimony of Dr. Miller and Mr. Wright definitely raised a 'sufficient question' as to Mr. Wright's mental responsibility at the time of the alleged offense."[42] This claim is a reference to *Whalem v. United States*, where this court held en banc that

> . . . when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case. . . . So, our query is whether in this case there was a combination of factors which required the trial judge to inject the insanity issue for, if such factors existed, his failure to do so is in an abuse of discretion and constitutes error.[43]

At the same time, the court noted that "[n]o rigid standard exists to control the District Court in deciding whether it should require the insanity issue to be submitted. As a matter within the sound discretion of the district court, this question must be resolved on a case by case basis."[44] To date, we have never overturned a district court determination on this issue.[45] Nor have we accepted guidelines proposed to limit district court discretion.[46] The reason for this continuing trust in the judgment of the district court is simple: the assessment of grounds for interposing the insanity defense is so factbound, so dependent on nuances of experts credibility and the defendant's presentation of himself, that the familiarity of the trial court is central to a sound decision.[47]

It is true that appellant's capacity to conform his conduct to the requirements of law at the time of the offense is doubtful. Compulsive aspects to his actions include his departure from a good job in California in order to perform a symbolic act in the nation's capital,[48] the repetitive nature of his prior similar acts,[49] and his spontaneous statement to the arresting officer that "Jehovah had sent [him]."[50] The psychiatrist most familiar with appellant testified that appellant suffered from a mental disorder

---

**42.** Appellant's Br. at 27.

**43.** 346 F.2d 812, 818–19 (D.C.Cir.), *cert. denied*, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 110 (1965).

**44.** *Id.* at 819 n.10.

**45.** We have approved both refusals to raise the defense, *e. g., United States v. Simms*, 463 F.2d 1273 (D.C.Cir.1972) (per curiam); *United States v. Bradley*, 463 F.2d 808 (D.C.Cir.1972) (per curiam); *Cross v. United States*, 389 F.2d 957 (D.C.Cir.1968); *Trest v. United States*, 350 F.2d 794 (D.C.Cir.1965) (per curiam), and decisions to inject the defense, *see United States v. Wright*, 511 F.2d 1311 (D.C.Cir.1975); *United States v. Ashe*, 478 F.2d 661 (D.C.Cir.1973). We have, however, remanded for clarification or supplementation of the record where the trial court had not fulfilled its duty to explore the issue fully. *See United States v. Snyder*, 529 F.2d 875 (D.C.Cir.1976); *United States v. Robertson*, 507 F.2d 1148 (D.C.Cir.1974).

**46.** *See United States v. Robertson*, 507 F.2d at 1158 (discussing *Cross v. United States, supra*, and *Hansford v. United States*, 365 F.2d 920 (D.C.Cir.1966)).

**47.** Appellant's counsel cites "criteria suggested" in previous decisions by this court. Appellant's Br. at 22. These include, for example, the "bizarre nature" of the crime and the probable success of an insanity defense. It should be clear that these and other factors were never intended to be determinative, but rather can be appropriately considered in support of particular analyses.

**48.** *See* p. 5 *supra.* Dr. Miller included this fact as a basis for his conclusion that Wright suffered from delusions. H.Tr.II at 20.

**49.** *See* n.26 *supra.* On cross-examination Dr. Sack was made aware for the first time of appellant's prior symbolic acts, which he conceded suggested a "driven, repetitive quality." H.Tr.I at 43. Dr. Sack reasoned that a driven quality could contribute to an expert finding of mental illness, but refused to modify his earlier statements that Wright acted from inner need, not compulsion. *Id.* at 44.

**50.** T.Tr. at 39 (testimony of Officer Travis Smith). *See* p. 7 & n.21 *supra* (Dr. Miller's diagnosis).

impairing his mental responsibility at the time of the offense.[51] The other two experts who disagreed with this conclusion in fact contributed testimony that would support the insanity defense.[52]

Nonetheless, there are also sound reasons for both appellant's and the trial court's decisions not to raise the defense. First, two experts testified that Wright did not suffer from a mental disease that substantially impaired his ability to obey the law.[53] Wright himself concurred,[54] and also indicated awareness that he knew at the time of the offense that he was breaking the law.[55] Second, there are sensible, logical reasons for assuming that this appellant would prefer a finite criminal sentence rather than an indeterminate commitment following an acquittal by reason of insanity.[56] The likely commitment would be to St. Elizabeths, an institution Wright knew for its poor—if not worse—conditions.[57]

Finally, Wright's expressed reason for rejecting the defense because it would compromise the principles motivating his actions is not irrational.[58] Two experts found his opposition to the defense not itself a product of mental illness.[59] The district judge had at least seven opportunities to observe Wright in the courtroom before deciding not to interpose the defense.[60] These considerations lend support to the district court's decision.

Most compelling, however, is the fact that the district court painstakingly followed all steps necessary to ensure full exploration of the insanity defense issue. The court ordered extra psychiatric evaluations in light

---

**51.** H.Tr.II at 9 (testimony of Dr. Miller). *See* n.10 *supra.*

**52.** Both Drs. Sack and Pepper identified paranoid elements in Wright's thinking. *See* nn.16 & 21 *supra.* Providing yet another example of experts mistaking their proper role in court, both Drs. Sack and Pepper also indicated that their opinions were shaped by their understanding of the *legal* definition of insanity. Dr. Sack suggested that Wright's paranoia interfered with his judgment, and that some pathology was indicated in Wright's apparent desire to provoke confrontation with the law. H.Tr.I at 20. He concluded, however, "in the context of my previous experiences with the judicial system and answering the questions as posed by the Court Order, I would answer that question that he was not suffering from a mental illness that made it impossible for him to conform his behavior with the requirements of the law." *Id.* Similarly, Dr. Pepper found Wright suffers "to an appreciable degree" from a personality disorder, but concluded that this did not meet the legal standard for insanity. H.Tr.I at 135–36. This kind of testimony dims the hope of meaningful insights from non-lawyer experts. *See Washington v. United States*, 390 F.2d 444, 446 (D.C.Cir.1962); Bazelon, *New Gods for Old: 'Efficient' Courts in a Democratic Society*, 46 N.Y.U.L.Rev. 653, 659 (1971). Nonetheless, combined with the defendant's own testimony and demeanor, the experts provided sufficient descriptions of the defendant's mental and intellectual processes to permit the court to rule.

**53.** *See* n.21 *supra.*

**54.** *See* pp. 10–11 & n.28 *supra.*

**55.** *See* p. 11 & n.38 *supra.*

**56.** Automatic civil commitment procedures are invoked in the District of Columbia when a defendant raises the insanity defense and is found not guilty on that basis. 24 D.C.Code § 301(d)(1). That defendant then bears the burden of proving by a preponderance of the evidence that he should be released. 24 D.C. Code § 301(d)(2). In an earlier case involving the instant appellant, this court held that these procedures *do not* apply where the insanity defense is raised by the court over defendant's objection. *United States v. Wright*, 511 F.2d 1311, 1313 (D.C.Cir.1975). *See* n.26 *supra.* Civil commitment then can follow only upon the government's initiation and proof that commitment is necessary beyond a reasonable doubt. 21 D.C.Code §§ 541–544; *See In re Ballay*, 482 F.2d 648 (D.C.Cir.1973). Dr. Pepper said that Wright understood that civil commitment, unlike a sentence following criminal conviction, could be indeterminate. H.Tr.I at 115.

**57.** Wright was committed to St. Elizabeths before this court's decision in 1975. *See United States v. Wright*, 511 F.2d 1311 (D.C.Cir.1975). Dr. Pepper reported that Wright did not wish to return to St. Elizabeths. H.Tr.I at 116. The quality care at St. Elizabeths and the hospital's accreditation have had checkered histories. *See, e. g.*, HEW Saint Elizabeths Hospital Initiative: Status Report (Sept. 1979).

**58.** *See* pp. 10–11 *supra.*

**59.** *See* p. 6 *supra.*

**60.** District Court Order at 4.

of the initial St. Elizabeths' report advising that Wright was competent to stand trial in spite of suffering from mental disease.[61] The court appointed amicus counsel, who effectively analyzed the procedural and substantive dictates of the law along with the evidence in this case.[62] At the two-day pre-trial hearing, the three experts and appellant each were examined at length by the prosecution, defense counsel, amicus counsel, and the judge. Finally, the judge fully expressed his reasons for declining to inject the defense,[63] including the credibility of the two experts and the appellant's opposition to the defense based on religious grounds and on his belief in his own sanity.[64]

As we interpreted *Whalem* in *United States v. Robertson*, 507 F.2d 1148 (D.C.Cir. 1974), the trial judge is

> of course not bound to adopt in whole or in part the views of any expert. But no appellant court in our position can sensibly decide whether the trial judge has explored and exercised his discretion as required by *Whalem* unless the trial

judge completes the exploration on the record and thereafter records in sufficient detail the reasons for his own expression of opinion.[65]

Because we find that the district court properly exercised its discretion in all respects, we affirm its judgment.

### III.

The government has taken the occasion of this appeal to urge modification of *Whalem*,[66] which permits a trial court to impose the insanity defense over a defendant's objection. The government asserts that a defendant's voluntary and intelligent waiver[67] of the insanity defense should *never* be overturned by the court.[68] Because we believe that *Whalem* better reflects the jurisprudential concerns underlying the defense, we cannot agree.

### A. *Alford* and *Faretta*

The government urges this court to reshape the *Whalem* rule in light of *North Carolina v. Alford*[69] and *California v. Far-*

---

**61.** *See* p. 4 *supra.*

**62.** The amicus counsel wrote two lengthy memoranda and examined witnesses at the pretrial hearing. This court suggested precisely this role for an amicus counsel when the trial court confronts a *Whalem* issue. *United States v. Robertson*, 507 F.2d 1148, 1158 (D.C.Cir.1974).

**63.** District Court Order at 4.

**64.** *Id.*

**65.** 507 F.2d at 1161. We remanded in *Robertson* because the only testifying experts believed the defendant was mentally responsible, and they were not cross-examined. On remand, the district court heard testimony that led it to find sufficient evidence of mental illness affecting mental responsibility to consider the insanity defense. Further, the defendant had changed his mind and expressed a vigorous desire to raise the defense, permitting the court to avoid acting against the defendant's desires. Accordingly, this court directed the trial court to conduct a new trial. *United States v. Robertson*, 529 F.2d 879, 880 (D.C.Cir.1976) (per curiam) (*Robertson II*). But during the voir dire of the new trial, the defendant changed his mind again. *United States v. Robertson*, 430 F.Supp. 444, 445 (D.D.C.1977) (*Robertson III*). The district court received further expert testimony

on the defendant's mental state and the court ultimately refused to impose the defense *sua sponte*. *Id.* at 447.

**66.** The government argues that *Whalem* rests on "dubious authority" that cannot withstand recent developments. Gov't Br. at 16.

**67.** *Id.* at 17–25 (discussing *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), *and Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). The government also points to a recent decision by the District of Columbia Court of Appeals, *Frendak v. United States*, 408 A.2d 364 (D.C.C. A.1979) (relying on *Alford* and *Faretta* to set "voluntary and intelligent" standard for accepting defendant's opposition to insanity defense). Even that court, however, reasoned that *Alford* and *Faretta* do not render *Whalem* unconstitutional. Moreover, we think the D.C. court's decision to depart from *Whalem* unpersuasive in the circumstances of this case. We treat its view in our discussion of the government's argument in this case.

**68.** Gov't Br. at 65.

**69.** 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

*etta.*[70] Neither case involved an insanity issue,[71] and for that reason alone their relevance is *de minimus.* When a criminal defendant's sanity is subject to question, doubt is cast not only on his competence to stand trial but also on the very capacity of our legal system to assign blame. The issue becomes whether there is sufficient question to require jury consideration of the defendant's ability to understand the law and conform his conduct to it[72]—that is, whether he can be considered an autonomous, choice-making actor deserving blame for alleged wrongdoing.[73] Protection granted a competent individual's choice has no bearing on this issue, which basically challenges the justification for punishment.

In this light, because *Alford* and *Faretta* protect rights of competent defendants, their holdings have little application to *society's* obligation, through the insanity defense, to withhold punishment of someone not blameworthy. A plainly nonfrivolous challenge to a defendant's mental responsibility requires inquiry because it suggests that the free will presupposed by our criminal justice system cannot be presumed. Thus, *Alford's* protection of a defendant's right to plead guilty, even while maintaining his own innocence, cannot similarly reserve the insanity plea decision to the defendant. Moreover, *Alford* itself is limited to permitting the self-claimed innocent's ability to *enter* a guilty plea.[74] Certainly, this provides no authority for entrusting the entire decision on the insanity defense to the defendant.

■ Similarly, *Faretta's* explication of the "right to self-representation"[75] has no bearing on the insanity issue. No defendant, whether acting *pro se* or through counsel, can restrain the court from considering whether the insanity defense should be raised. Even the right to self-representation at trial does not grant license to reshape the very foundations of our criminal law.[76]

## B. *The Role of the Defendant's Choice*

■ We cannot abdicate to the defendant the judicial duty to explore the issue once

**70.** 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

**71.** *Alford* involved a defendant who wanted to plead guilty while maintaining his innocence, 400 U.S. at 37–38, 91 S.Ct. at 167, *Faretta* involved a defendant who wanted to conduct his own defense, without appointed counsel, 422 U.S. at 834, 95 S.Ct. at 2540.

**72.** As one scholar put it over two centuries ago, "[t]he guilt of offending against any law whatsoever, necessarily supposing a willful disobedience, can never justly be imputed to those, who are either incapable of understanding it or of conforming themselves to it." 1 W. Hawkins, Pleas of the Crown 1 (1716). *See also* H. Packer, The Limits of the Criminal Sanction 133 (1968) ("to impose the moral condemnation of a criminal conviction on a person who is thought to have acted in a state of severe volitional impairment would be to abandon the notion of culpability in its most crucial use").

**73.** Acknowledging philosophic debates about the existence of free will, Professor Packer has explained that the criminal system operates "*as if* human beings have free choice." H. Packer, *supra* n.72 at 132. He concluded, "[w]e must put up with the bother of the insanity defense because to exclude it is to deprive the criminal law of its chief paradigm of free will." *Id.*

**74.** Our holding does not mean that a trial judge must accept every constitutionally valid guilty plea merely because [the] defendant wishes to so plead. A criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the Court, . . . although the States may by statute or otherwise confer such a right.
400 U.S. at 38 n.11, 91 S.Ct. at 168. The Court also directed that a self-claimed innocent defendant can submit a guilty plea only if he acts "voluntarily, knowingly and understandingly," *id.* at 37, 91 S.Ct. at 137. Further, a factual basis for the guilty plea is necessary for the trial court to accept it. *Id.* at 38 n. 10, 91 S.Ct. at 167.

**75.** 422 U.S. at 819, 834–35, 95 S.Ct. at 2540–41.

**76.** The Supreme Court in *Faretta* expressly announced that the right to self-representation is not a "license not to comply with relevant rules of procedural and substantive law." 422 U.S. at 834–35 n.46, 95 S.Ct. at 2540, 2541. Thus, no defendant, acting *pro se* or through counsel, has license to avoid the criminal law's constant concern not to impose punishment where it cannot impose blame.

sufficient questions are raised.[77] Nonetheless, our reasoning does not disparage the importance of the defendant's preference to avoid the insanity defense. The inquiry by the court under *Whalem* necessarily includes exploration of the defendant's choice and point of view. The line between mental responsibility and irresponsibility may be thin, and errors falling on both sides likely. The problem is especially treacherous where the defendant justifies his conduct as political or religious expression.[78] We know the danger of a Big Brother state that treats its critics as mentally ill.[79] When doubts about a defendant's mental condition remain after a full inquiry, the strength and reasons for the defendant's opposition to the defense become all the more important and may tip the balance.[80] This flexibility is consistent with *Whalem*.

■ The government argues that the *Whalem* inquiry should be replaced by a single question: Is the defendant's opposition to the defense voluntary and intelligent?[81] We believe this test, imported from *Alford*, would disserve the necessary assessment of mental responsibility,[82] and would in practice merely recreate the *Wha-lem* inquiry under new and less candid labels. Under *Whalem*, the trial judge considers the defendant's opposition to the insanity defense and the quality of his reasoning.[83] The court may also weigh "the quality of the evidence supporting the defense," "the reasonableness of the defendant's decision to raise the defense," and "the Court's personal observations of the defendant."[84]

■ The government's proposed investigation into the voluntariness and intelligence of the defendant's decision by necessity bootlegs each of these considerations into the court's analysis. The proposed inquiry clearly extends beyond mere competence to stand trial. Such competence involves only minimal ability to understand the proceedings and assist defense counsel.[85] The proposed "voluntariness" criterion mandates assessment of the defendant's ability to decide how to plead, that is, his capacity to decide free from coercion from without or from within. In a real sense, a defendant lacking mental responsibility cannot "voluntarily" waive the insanity defense.[86] The "voluntariness" portion of the government's proposal thus inevitably turns to the strength of the possible insanity de-

---

77. *See* p. 13 *supra.*

78. *See* p. 12 & n.41 *supra.*

79. For a powerful discussion of the political uses of psychiatric treatment in the Soviet Union, see H. Fireside, Soviet Psycho-Prisons (1979); A. Podrabnik, Punitive Medicine (1979).

80. The defendant's opposition to the defense may reflect his understanding of his mental state at the time of the alleged offense. It may also provide more general insight into the quality of his reasoning. Finally, it may deserve ultimate deference where insanity has not been established, and the defendant's own dignity and decisionmaking require respect.

81. Gov't Br. at 65. This is the standard adopted by the D.C. Court of Appeals. *See Frendak v. United States,* 408 A.2d 364 (D.C.C.A.1979).

82. See pp. 19–20 *supra.* It is also worth noting that *Alford* and *Faretta* simply reaffirm longstanding principles. Their holdings thus do not raise novel concerns unanticipated by the *Whalem* court.

83. *E. g., Cross v. United States,* 389 F.2d 957, 960 (D.C.Cir.1968) ("Although *Whalem* makes clear that the court must have the last word upon whether the insanity defense is to be raised, the defendant's wishes are highly relevant."). *See United States v. Robertson,* 430 F.Supp. 444, 446 (D.D.C.1977).

84. 430 F.Supp. at 446. *See United States v. Simms,* 463 F.2d 1273, 1277 (D.C.Cir.1972).

85. *E. g., Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Experts tailor their opinions on a defendant's competency to stand trial to match these minimal abilities. *See, e. g.,* Letter from Dr. F. Jay Pepper to Roger Adelman, Assistant U.S. Attorney (Sept. 25, 1978), Government Exhibit # 2 (Beachey Wright "is presently mentally competent to understand the proceedings against him and to confer with counsel to assist properly in the preparation and conduct of his defense").

86. Often, mentally ill individuals do not or cannot acknowledge their illness. *See O'Conner v. Donaldson,* 422 U.S. 563, 584, 95 S.Ct. 2486, 45 L.Ed.2d 396 (Burger, C. J., concurring).

fense—and raises the matters covered in a *Whalem* inquiry.[87] The court must determine whether the defendant was free from delusion or psychosis in rejecting the defense.[88]

■ Similarly, the proposed "intelligence" criterion introduces *Whalem* concerns because "intelligence" must involve more than evidence that a reasonable defendant would decline the defense. The stigma and risk of confinement associated with a successful insanity defense [89] provide grounds for always finding opposition to the defense "intelligent." An "intelligent" decision in this context must reflect the quality of the defendant's own reasoning and the circumstances under which the plea decision is made. Thus, the "intelligence" of the defendant's choice can be determined only by an inquiry into the *merits* of his choice—precisely the *Whalem* examination. Such an inquiry considers the risks of both improperly assigning criminal responsibility and unwisely imposing the insanity defense against the individual's wishes.

■ Thus, in all likelihood, the approach recommended by the government involves merely a minor—and perhaps misleading—change in symbolic emphasis. By focusing attention on the quality of the defendant's pleading decision, the government proposal tends to obscure society's obligation to determine blame-worthiness before imposing sanctions. Without hiding this obligation, a specific inquiry into the quality of a defendant's decision to waive the insanity defense is permitted and encouraged under *Whalem*. The trial court has authority to order a report on a defendant's competency to stand trial [90] and on his mental responsibility at the time of the alleged offense.[91] So too may the court discharge its responsibility by pursuing specific expert evaluation of the quality of the defendant's decision to oppose the insanity defense. We have not found *Whalem* and its progeny to stifle or distort the necessary inquiry; indeed, unlike the government's proposal, *Whalem* permits candid assessment of relevant factors.

## C. The Decision Below

■ Ultimately, the court itself must grapple with the dilemma posed by the limits of the criminal sanction and the risks

---

**87.** There may be cases in which the defendant changes so markedly between the time of the alleged offense and trial that his condition at trial bears little relationship to his mental responsibility at the time of the offense. As a practical matter, and as demonstrated in this case, assessment of a defendant's mental condition when deciding how to plead is intimately connected to indications of his earlier condition.

**88.** The requirement of a particularized competency finding is analogous to the trial court's duty to find specifically whether a defendant competently waived his right to counsel. *Westbrook v. Arizona*, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966) (granting motion for leave to proceed in forma pauperis and petition for writ of certiorari). Similarly, our court has held that competence to stand trial alone does not establish competence to waive a jury trial, *United States v. David*, 511 F.2d 355 (D.C.Cir.1975).

In the same vein, the Ninth Circuit has held more generally that a mere finding of competence to stand trial is inadequate to sustain the defendant's waiver of a constitutional right.

*Sieling v. Eyman*, 478 F.2d 211, 214–15 (9th Cir. 1973). That court also approved language from an earlier dissenting opinion:

Judge Hufstedler, in *Schoeller v. Dunbar*, 423 F.2d 1183, 1194 (9th Cir. 1970) has suggested the following standard: "A defendant is not competent to plead guilty if a mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature of the consequences of his plea." We think this formulation is the appropriate one, for it requires a court to assess a defendant's competency with specific reference to the gravity of the decisions with which the defendant is faced.

*Id.* at 215 (footnotes omitted).

**89.** *See Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190, 1198–1200 (1974).

**90.** 24 D.C.Code § 301(a).

**91.** *Winn v. United States*, 270 F.2d 326, 328 (D.C.Cir.1959).

of a paternalist state. As revealed in this case, the trial judge can ably confront this dilemma by drawing on experts and on the amicus counsel. The trial judge can give weight to the reasons proffered by the defendant, as he did here.[92] But such reasons cannot be determinative, anymore than can a bare finding of competency to stand trial. Instead, where a defendant opposes the insanity defense, but experts or the defendant's conduct before the court suggest the defense may be appropriate, the court must consider and explain its view of the defendant's competence to assess his own moral culpability,[93] and society's concern to punish only those worthy of blame.

Because we find such examination was competently completed and carefully explained below, we affirm.

*So ordered.*

---

92. *See* pp. 10, 17 *supra.*

93. The district court was ably assisted in this regard by the amicus counsel who urged careful exploration of "the quality of the defendant's decision not to raise the defense." Amicus Memo # 1 at 13.